# Woods's Appeal.[1]

1. The constitutional convention of 1873 had no inherent rights; it had powers only.

2. The Bill of Rights is a reservation of rights out of the general powers to the people themselves, not a delegation of powers to a convention.

3. The convention was under the rule, that no agent or subordinate can claim the powers, liberties or franchises of the people except by their express grant or by plain and certain implication.

4. The people had the same right to limit the powers of their delegates as to bound the powers of their representatives.

5. The legislature cannot confer powers inconsistent with the rights, safety and liberties of the people, because no consent can be implied, but they may pass limitations in favor of their essential rights.

6. The convention called under the Acts of 1871 and 1872 could not take from the people their sovereign right to ratify or reject the constitution or ordinance formed by it, and could not infuse life or vigor into its work before ratification by the people.

October 9th 1874. (At Pittsburg.) Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Appeal from the Court of Common Pleas of *Allegheny county*: In Equity: No. 37, to October and November Term 1874.

On the 2d of December 1873, Robert Woods and Reese Owens filed a bill against Matthew S. Quay, Secretary of the Commonwealth of Pennsylvania, John H. Hare, sheriff of Allegheny county, James G. Murray, and others, commissioners of Allegheny county.

The bill set forth that the plaintiffs were citizens and tax-payers of Allegheny county, and of the Commonwealth of Pennsylvania; it also set forth the Act of June 2d 1871, authorizing a vote for the call of a convention, and that a majority of votes had been cast in favor of calling a convention; it averred that the act was unconstitutional and repugnant to the tenth article of the constitution, which provides that amendments to the constitution are to be proposed to the Senate and House of Representatives, published in their journals and advertised; and if such amendments should be agreed to by the next legislature, they should be advertised and submitted to the people, and if ratified by a majority of their votes, should become part of the constitution; the bill further averred that by an Act of April 11th 1872, it was illegally attempted to confer upon the electors of the Commonwealth the right to select delegates to the convention in violation of the tenth article of the constitution above mentioned, and in violation of the first section of the third article of the constitution of Pennsylvania, giving to every elector the right to vote for as many

---

[1] This case involving questions as to the powers of the Constitutional Convention of 1873, it is published, out of its chronological order, and proper district, in connection with the case of Wells *v.* Bain immediately preceding, ante, p. 39.

[Woods's Appeal.]

persons as by law are to be chosen to fill the offices, &c., recognised by the constitution and laws of the Commonwealth, and in violation of the fifth section of the ninth article of the constitution, which declares that " elections shall be free and equal," that the Act of 1872 deprived the plaintiffs and other citizens of a right to vote for persons for delegates to the convention and " illegally prevented your orators from casting their votes at said election in the manner and to the extent heretofore allowed and practised under the constitution and laws of this Commonwealth, and said election so held was not 'free and equal;' that under and in pursuance of said act, nine delegates were to be chosen by qualified electors of said county, to said Constitutional Convention, and your orators were constitutionally and legally entitled to vote at said election for that number as delegates, but they allege the right so to do was by said act denied them, and by its terms and provisions they were only given the right to vote for six of said delegates; that said Act of Assembly is framed upon the. theory that a majority of the votes cast at said election shall not prevail to elect the whole number of persons to be chosen for any given district as delegates to said Constitutional Convention. ·Your orators expressly charge that said act denies the right of the majority to govern in the holding of elections, is anti-republican in principle, and wholly opposed to and subversive of the rights of the electors of this Commonwealth, and will introduce, if adopted, a dangerous and disturbing element in the laws and constitution under which we live, and is in violation of the fourth section of the fourth article of the Constitution of the United States, which declares (*inter alia*) that the 'United States shall guarantee to every state in this. Union a republican form of government;' * * * that delegates chosen to said convention to the number of one hundred and thirty-three, met on Tuesday, the 12th day of November, A. D. 1872, and illegally organized themselves as a convention to amend the constitution of said Commonwealth; that said delegates were not elected in the several districts where voted for, by a majority of the votes cast in said election, but under and in pursuance of the provisions of said act, whereby a minority representation was allowed, and persons permitted by said convention to sit and act therein as delegates who had not received a majority of all the votes cast in the respective election districts which they were claiming to represent; * * * that during the session of said convention vacancies occurred ·in the membership thereof by the death and resignation of delegates, which vacancies were supplied in the mode pointed out by the 8th section of said Act of April 11th 1872, which action in supplying vacancies was unconstitutional and void; * * * that said Constitutional Convention arrogated to itself the exercise of legislative powers in violation of the existing constitution of Pennsylvania, and, in disregard of

[Woods's Appeal.]

the Act of Assembly under which said convention delegates were elected, did undertake to and did pass what is termed 'An ordinance for submitting the amended constitution of Pennsylvania to a vote of the qualified electors thereof,' wherein and whereby it did illegally ordain that the election on said amended constitution should be held and conducted as in said 'ordinance' prescribed, thereby illegally disregarding the limitations prescribed by the fifth and sixth sections of the act aforesaid, under which the delegates to said Constitutional Convention were elected." * * *

The bill charged that M. S. Quay, secretary of the Commonwealth, declared that he would comply with the provisions of the aforementioned "ordinance" of the convention, imposing duties upon him in relation to the submission of the amended constitution to a popular vote; that John H. Hare, sheriff of the county of Allegheny, has published in sundry newspapers his proclamation for holding an election on the 16th of December next to pass upon the amendments, and that James G. Murray and others, commissioners of Allegheny county, had declared that they would perform the duties imposed on them by the aforesaid ordinance, &c. The prayer was for an injunction to restrain the defendants from acting in the premises as above set forth; that the Acts of June 2d 1871, and April 11th 1872, be declared unconstitutional and void; that the convention convened under the Act of 1872 was an illegal body and its acts without authority of law; that the "ordinance" of the convention was unconstitutional and void.

The substance of the Acts of 1871 and 1872, and the ordinance referred to in the bill in this case, will be found in the preceding case, Wells v. Bain.

The defendants demurred to the bill, and the case was heard on bill and demurrer.

The court (Stowe, J.) dismissed the bill in the following opinion:—

"Waiving for the present the minor questions involved in this demurrer, with reference to the right of plaintiffs to have the relief they ask, in case the allegations of the bill regarding the unconstitutionality of the Acts of Assembly, through which the Constitutional Convention of 1872 was convened, are correct, we come at once to the great question of the legal force and effect of the several Acts of Assembly specified in the bill. It is undoubtedly correct, as claimed by counsel for respondents, that the demurrer admits only the truth of the several *facts* alleged, and not the conclusions of law set out as arising from these facts; and therefore we are bound to determine for ourselves as a constitutional part of the cause, whether these conclusions are warranted by the facts, and not assume these Acts of Assembly are unconstitutional simply because it is so alleged in the bill.

[Woods's Appeal.]

" I have no difficulty in concluding that if the Acts of Assembly in question are unconstitutional and void the convention was an illegal body, and its acts revolutionary, and that in such case it would be the duty of courts to exercise all their authority to prevent its mandates being carried into effect to the injury of any individual; that the legislature would be bound to enact such laws as might be necessary to punish any attempt to force upon the people its revolutionary work, and the executive officers of the state to use all their power, civil and military, to suppress it.

" If, however, in the face of all this, such force, moral or physical, was brought to bear as to overawe or compel the submission of the legal authorities of the state, then, indeed, the arm of the law would be paralyzed, and the proposed constitution would become effective, not by the law, but by that higher right of revolution which is above all law, but is nowhere recognised by it. Courts can know nothing by anticipation. They are bound to determine the law as it is previous to the successful accomplishment of revolution, as though such a fact were impossible; but when accomplished and duly recognised by the political powers of the government, the courts have no alternative but to accept the fact without question and act accordingly.

" While, then, courts must recognise the powers that be, though the product of revolution, they are bound to use all their legitimate authority to suppress acts actually or ostensibly revolutionary, as though they were simply rebellious and could never become legitimate.

" Coming, then, to the question of the constitutionality of the act to authorize a popular vote upon the question of calling a convention to amend the constitution, approved June 2d 1871, and also the act passed subsequent to the election, held in pursuance of the same, entitled 'An act to provide for calling a convention to amend the constitution,' approved April 11th 1872, raised by the 2d, 3d, 4th, 5th, 6th and 7th sections of complainants' bill, it is claimed that they are both unconstitutional and invalid, because:—

" 1. There is no power given by the present constitution to the legislature, authorizing such a proceeding.

" 2. There is a different method provided by the constitution, by which it may be amended, and, therefore, upon well-recognised principles of law, the legal conclusion arises that no other exists.

" It cannot be claimed that the authority for the legislation and proceedings taken in reference to calling this convention, are expressly set out in the constitution, but it is argued that the power arises under the second section of the Declaration of Rights, which declares that 'all power is inherent in the people and all free governments are founded on their authority, and instituted for their peace, safety and happiness. For the advancement of these

ends they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such a manner as they may think proper,' all of which is, *inter alia*, excepted out of the general powers of government and is 'for ever to remain inviolate.'

" It is difficult to see how the withholding of power from the government can, strictly speaking, create a right in the legislature from which it is thus withheld, to exercise that power; but if it should appear that such power exists above and before the constitution as a great natural and indefeasible right, and has been so recognised and acted upon frequently as a fundamental principle underlying all free government, this provision will sufficiently appear to be a solemn declaration of the existence of such a right, and may in ordinary parlance fairly be said, without any great breach of legal accuracy, to confer a power under the constitution.

" Before, however, entering into a consideration of this question, it will be necessary to examine whether there is anything in the constitution, as urged in the second proposition, which directly or by necessary legal implication takes away such a fundamental right as we have suggested, in case it existed, where there is no constitutional restriction.

" It is urged, and with much apparent force, that because the constitution in the tenth article 'of amendments' provides a certain and carefully-defined way for amending the fundamental law, the well-recognised legal maxim ordinarily applied to the construction of deeds and written instruments, as well as acts of legislation, ' *Expressio unius est exclusio alterius*,' leads to the fixed legal presumption that no amendment can, under the constitution, be made to it, except in the way thus especially provided.

" This rule enunciates one of the first principles to the construction of any ordinary instruments between parties: Lord Denman, C. J., 5 Bing. N. C. 185; but great caution is requisite in its application: Price *v.* The Great Western Railway Co., 16 M. & W. 244; Broom's Legal Maxims 595; and it has long been settled in commercial transactions that custom and usage are allowed to control or rebut the implication arising under the rule.

" Mr. Broom says : ' While this rule is of important and extensive application, both in the construction of written instruments and verbal contracts, as also in the determining the inferences which may fairly be drawn from expressions used, or declarations made with reference to particular circumstances, it is by no means of universal conclusive application.' For example, it is a familiar doctrine, that though where a statute makes unlawful that which was lawful before, and appoints a specific remedy, that remedy must be pursued, and no other; yet where the offence was antecedently punishable by a common-law proceeding, and a statute prescribes a particular remedy in case of a disobedience, that such

25 P. F. SMITH—5

remedy is cumulative, and proceedings may be had either at common law or under the statute.

" Custom and usage have also been allowed to aid in interpreting Acts of Parliament, 'and that exposition,' says Lord Coke, 'shall be preferred which is applied by constant use and experience.' It is by no means certain that the maxim alluded to should find any favor as a general rule of interpretation of an instrument like a constitution, which must of a necessity deal in generalities; but at all events, if so applied, it must in all such cases be considered as overcome by any established or common usage or understanding, indicating a different conclusion.

" Mr. Jamison, in his work on Constitutional Conventions, p. 573, says, with great force, upon this question: 'Viewed upon principle, were there no authority upon the point, it would be doubtful whether, dealing in great questions of politics and government, the same maxim ought to prevail which regulates the constructions of contracts between man and man. As a matter of speculation it may be admitted that the rule expresses the weight of probability equally in cases of great and small magnitude. But there is always a doubt; and between the cases indicated, there is the wide difference, that in ordinary contracts it is possible to enforce the construction which the courts shall pronounce the true one, whilst in the case of constitutional provisions regulating great organic movements, to hold such a maxim applicable would be, by presenting barriers to the attainment of what the people generally desire, to make that revolutionary which perhaps was not so. Where the intention of the framers of a constitution is doubtful, the people assuming power under the broader construction, should have the benefit of the doubt; and that all the more because in opposition to them our courts are comparatively powerless. It is infinitely better where no principle is violated, that a constitution should be so construed as to make their action legal rather than illegal.'

" So far as judicial opinion is concerned, it has been said by the Supreme Court of New York, that the maxim is to be applied to ordinary contracts, rather than constitutional provisions: Barto *v.* Hirmrod, 4 Selden 483; while the judges of the Supreme Court of Massachusetts have expressed a different opinion (6 Cushing 573), holding that under the Constitution of Massachusetts, containing a provision substantially like our own, no power existed to amend, except as provided in the article of Amendments. As a matter of history, however, a convention was called by the legislature in 1853, twenty years after this opinion was given, to propose a constitution; and while the question was raised as to the legality of such convention, it was ably vindicated by the best lawyers in the state, among them Choate, Parker and Morton, the latter one of the judges of the court at the time the

opinion was given; and a constitution prepared and submitted to the people.

"Turning now to the history of the government of the various states, for the purpose of discovering what the usage in such cases has been, we find the practice has been so frequent and uniform as clearly to indicate what the common understanding of the people, lawyers and laymen, has been in regard to this question.

" So far as I am able to learn, there had been, in 1865 (throwing out of consideration the rebel states during 1861, and afterwards while undergoing reconstruction), twenty-five constitutional conventions called by the legislatures of the various states, without any special authorization in their constitutions.    In Georgia, January 4th 1789, May 4th 1789 and 1838.    In South Carolina, 1790.  In New Hampshire, 1791.    In New York, 1801, 1821 and 1846.  In Connecticut, 1818.    In Massachusetts, 1829, 1853.    In Rhode Island, 1824, 1834, 1841, and 1842.    In Virginia, 1829, 1854 and 1864.    In North Carolina, 1835.    In Pennsylvania, 1837.  In New Jersey, 1844.    In Missouri, 1845, 1861 and 1865.    In Indiana, 1850.

"Mr. Webster stated in 1848, in his argument before the Supreme Court of the United States, in the case of Luther v. Borden, 'that of the old thirteen states, their constitution with but one exception, contained no provision for their own amendment, yet there is hardly one that has not altered its constitution, and it has been done by conventions called by the legislature, as an ordinary exercise of power.'    If this is true, and my own examination, so far as, with the limited time and opportunity since the argument of this case, I have been able to make it, has verified it, as well as shown the continuation of the same practice to the present day, it would seem as though the question as to whether the calling of a constitutional convention was a legal exercise of power by the legislature, should now be considered by all judicial tribunals as settled so firmly as a part of the common law of our governments, that any attempt to disturb it at this day would savor more of revolution than legitimacy.    He would be bold indeed, who would now assert that all these conventions were usurpations, and that all the constitutions proposed by them and adopted by the people were revolutionary.

" The conclusion that I have drawn from all this is, that there is underlying our whole system of American government a principle of acknowledged right in the people to change their constitutions, *except where especially prohibited in a constitution itself*, in all cases and at all times, whether there is a way provided in their constitution or not, by the interposition of the legislature, and the calling of a convention, as was done in the case in hand.

" The offspring of revolution originally, but restrained and modified by the necessity arising out of the new principle estab-

lished in this country, by the accomplishment of our national independence, that the people are the government, and not the king, and the source of all political power,—it has become legitimated, and without mention in our constitutions, is as much the law of the land as if specifically set out in them: and that as a solemn recognition of *this*, and not as a revolutionary right, the section of the Declaration of Rights in our own, and similar clauses in other state constitutions, were inserted.

" The somewhat similar expression contained in the Declaration of Independence, was clearly revolutionary and so intended to be; but that was a paper published to the world to justify our refusal to submit longer to governmental authority, and spoke of the rights of the people, as against the oppression of constituted authorities; but in all instruments established by the people themselves for their own government, the only rational view is to consider it as above stated, the introduction of a constitutional and legal revolution, by the *consent* of the constituted authorities of the state.    This last is absolutely indispensable, as is now admitted by all.    To give the force and effect of the law to the proceeding, it must emanate from the legislative authority, and be the result of its permission or direction.    The only way the people can legally act under a constitution such as ours, is through their representatives, and therefore, no matter how many may favor a convention to change the constitution, if one should·be called, and convene without proper authority from the existing government, its action would be clearly illegal, and the result of illegitimate power.    It follows then, that the action of the legislature in authorizing a vote of the people on the question of the amendment of their constitution, and subsequently by another act authorizing the election of delegates, was a legal exercise of legislative power, and constitutional, unless something in the acts themselves is in conflict with some constitutional provision.

" This is claimed by the plaintiffs in the fourth section of their bill, because, they say these acts are in violation of the first section of the third article of the constitution, which gives, as they allege, to every qualified voter, the right to vote for as many persons as are to be chosen to fill offices, and of the fifth section of the ninth article, which provides that 'elections shall be free and equal.'

" Suffice it to say as the first suggestion, that the constitution nowhere provided that every elector shall have a right to vote for as many persons as are to be chosen; nor do I think it at all a necessary implication in cases of offices which may be created and made elective by the legislature.    In cases of what are called constitutional offices, a different question is presented, which we need not now consider.

" The second objection is, that it violates the clauses requiring elections to be free and equal.    A careful consideration of this

provision, and a comparison of it with similar and kindred provisions in the constitutions of other states, satisfies me that no such limitation as here suggested is contemplated by this provision.   I understand it to be nothing more than a declaration, that elections shall be public, and open to all duly qualified alike, without discrimination as to individuals or classes.   From these views it appears that the objection raised to the manner of electing the delegates to the convention are not valid, and that both the acts mentioned, are in our opinion constitutional, and the delegates to the convention were legally elected.

" The 8th, 9th and 10th paragraphs of the bill complain of illegal acts done by the convention : *first*, in refusing a separate submission to a popular vote of the fifth article, relating to the judiciary, the contingency having arisen, under which, by an act of the legislature, they were bound to do so ; and *second*, in altering several of the provisions of the bill of rights contrary to the limitations imposed in the fourth section of the Act of April 11th 1872 ; and *third*, in disregarding the Act of Assembly, under which the convention was called, in regard to submitting the amended constitution to a vote of the people, and ordaining a different method.

" These objections are all consistent with the conclusions already arrived at, and if valid would raise further questions under the bill, notwithstanding what has already been said, and should therefore be considered.

" In examining these questions, the first and second may be taken together.

" Looking upon general principles at the real question involved, which is how far, if at all, a Constitutional Convention regularly called, may legally disregard limitations imposed upon its actions by the legislature, I have no difficulty in arriving at what seems to me to be the correct rule.   A convention to amend the constitution, without there is an express limitation as to the extent of their power, passed upon by the people in determining the question of amendment, has inherently, by the very nature of the case under the great principle peculiarly American, and *quasi* revolutionary in its character heretofore mentioned, absolute power, so far as may be necessary to carry out the purpose for which they were called into existence, by the popular will.   Unless prohibited or restricted in the manner specified by the people, the convention has a right, untrammelled by mere legislative limitations, to propose to the people for their consideration and adoption any plan they may see fit.   In saying this, we are not to be understood as saying that the convention is in any respect the supreme power of the state.   We take it to be simply *the attorney for the people*, with plenary power to do what is required of it, but nothing beyond.

" Subject to the limitation just mentioned, a constitutional con-

[Woods's Appeal.]

vention, in the language of Mr. Wilson, in the Federal Convention of 1787, has the power to conclude nothing, but to propose anything.

" Such too, is the inevitable result of the views already expressed as to the purpose and effect of the second section of the Declaration of Rights. If it be taken as a constitutional recognition of the principle of legal revolution (so to speak), and of a popular power as we believe, the obvious result follows, that when once called into operation by proper authority, it cannot be subverted nor restrained by the legislature.

" If this is correct, the convention was right in disregarding the limitations sought to be imposed upon its power, both as to what it should propose to change in the present constitution, and how the proposal should be submitted to the people, for their adoption or rejection.

" The third point, raising the question of the right of the convention to provide a way by ordinance, different from and substantially repealing the act of the legislature, presents a very different question from the one just considered. It is, however, immaterial to the determination of the real issue in this case. Assuming it to be an excess of power, the complainants can be in no wise affected by it as tax-payers. It is entirely immaterial to them in that respect, whether the ordinance is legal or illegal. Their only interest is that of knowing whether the convention had such a power or not, as a mere abstract question, which gives them no standing in court. So far as this county is concerned, there was no attempt by the convention to change the law made by the legislature. The election which will be held within our jurisdiction, and for which the complainants as tax-payers may be called upon to pay, will be held under what the complainants themselves say is the law, unless the submission of the proposed new constitution is itself, as it stands to-day, illegal and unconstitutional.

" There are other questions involved in the case, as to the standing and equity of the plaintiffs under this bill, in view of the relief prayed for, but the conclusions already expressed, render it unnecessary to examine them.

" The result is, the demurrer must be sustained and plaintiffs' bill dismissed."

The plaintiffs appealed to the Supreme Court, and assigned for error the decree sustaining the demurrer and dismissing the bill.

*R. Woods*, for appellants.

*R. B. Carnahan*, for appellees.

The opinion of the court was delivered, November 2d 1874, by AGNEW, C. J.—The change made by the people in their political

[Woods's Appeal.]

institutions, by the adoption of the proposed Constitution since this decree, forbids an inquiry into the merits of this case. The question is no longer judicial, but in affirming the decree we must not seem to sanction any doctrine in the opinion, dangerous to the liberties of the people. The claim for absolute sovereignty in the convention, apparently sustained in the opinion, is of such magnitude and overwhelming importance to the people themselves, it cannot be passed unnoticed. In defence of their just rights, we are bound to show that it is unsound and dangerous. Their liberties would be suspended by a thread more slender than the hair which held the tyrant's sword over the head of Damocles, if they could not, while yet their existing government remained un-changed, obtain from the courts protection against the usurpation of power by their servants in the convention. When they become complainants, the convention must defend and show their authority.

It was contended in the case of Francis Wells et al. v. James Bain et al., involving the legality of an ordinance of the convention, argued at Philadelphia in December last (antea p. 39), that the convention had the power to ordain ordinances having the present force of law; and the instant power to proclaim a constitution, binding without ratification, irrespective of the matter adopted by the people, to exercise their right to alter or amend their frame of government. This imputed sovereignty in a convention called and organized under a law, as the very means 'adopted by the people to exercise their reserved right of amendment, owing to the briefness of the time, was not discussed in that case with the fulness the importance of the question to the people demanded.

There is no subject more momentous or deeply interesting to the people of this state than an assumption of absolute power by their servants. The claim of a body of mere deputies to exercise all their sovereignty, absolutely, instantly, and without ratification, is so full of peril to a free people, living under their own instituted government, and a well matured bill of rights, the bulwark and security of their liberties, that they will pause before they allow the claim and inquire how they delegated this fearful power and how they are thus absolutely bound and can be controlled by persons appointed to a special service. Struck by the danger, and prompted by self-interest, they will at once distinguish between their own rights and the powers they commit to others. These rights it is, the judiciary is called in to maintain. The very rights of the people and freedom itself demand, therefore, that no such absolute power shall be imputed to the mere delegates of the people to perform the special service of amendment, unless it is clearly expressed, or as clearly implied, in the manner chosen by the people to communicate their authority.

A convention has no inherent rights; it exercises powers only. Delegated power defines itself. To be delegated it must come in

some adopted manner to convey it by some defined means.   This adopted *manner* therefore becomes the measure of the power conferred.   The right of the people is absolute in the language of the bill of rights, " to alter, reform or abolish their government in such *manner* as *they* may think proper."   This right being theirs, they may impart so much or so little of it as they shall deem expedient.   It is only *when* they exercise this right, and not before they determine by the mode they choose to adopt, the extent of the powers they intend to delegate.   Hence the argument which imputes sovereignty to a convention, because of the reservation in the bill of rights, is utterly illogical and unsound.   The bill of rights is a reservation of rights out of the general powers of government to *themselves*, but is no delegation of power to a convention.   It defines no manner or mode in which the people shall proceed to exercise their right, but leaves that to their after choice. Until then it is unknown how they will proceed, or what powers they will confer on their delegates.   Hence we must look beyond the bill of rights to the mode adopted by the people, to find the extent of the power they intend to delegate.   These modes were stated and discussed in the opinion in Wells *et al.* *v.* Bain *et al.*, *supra*.   If, by a mere determination of the people to call a convention whether it be by a vote or otherwise, the entire sovereignty of the people passes *ipso facto* into a body of deputies or attorneys, so that these deputies can without ratification, alter a government and abolish its bill of rights at pleasure, and impose at will a new government upon the people without restraints upon the governing power, no true liberty remains.   Then the servants sit above their masters by the merest imputation, and a people's welfare must always rest upon the transient circumstances of the hour, which produce the convention and the accidental character of the majority which controls it.   Such a doctrine, however suited to revolutionary times, when new governments must be formed, as best the people can, is wholly unfitted when applied to a state of peace and to an existing government, instituted by the people themselves and guarded by a well matured bill of rights.

To impute absolute power to a convention of mere delegates, from a vote on the simple question of calling it, as for example under the Act of 1871, is to assume a grant by the people without terms, without the means of limitation, and without any clearly evinced intent.   It is an assumption without a just basis against the security, the interest and the welfare of the people, which no body of men have a right to make, and no judicial reason or rule can justify.   It contravenes the rightful and necessary prerogative of the people to determine their own institutions by ratification or rejection, and in this respect contravenes the very language and spirit of the bill of rights by which they reserved to themselves the right to change their form of government.   It also conflicts with

that universal rule, that no agent or subordinate can claim the powers, liberties or franchises of the people, except by their express grant, or by a plain and certain implication.    What intent is more doubtful?    Nay, what clearer *non sequitur* is it than to affirm, because a people vote to call a convention, they therefore strip themselves of their most essential power to ratify or reject the work of their delegates ?    The inference is the very reverse, for a vote for a convention, which must be called afterwards by law, from its very nature refers the constitution and powers of a convention so to be called, to the law, which the people use to accomplish their purpose.    Such was the nature of the Act of 1871. It was simply an order (assuming its mandatory character) to call a convention.    It was not a call itself, and it provided no terms in which the call should be made.    The people were silent on this point, and therefore no implication can be made against their essential right to protect themselves.    The mandatory character of the call does not alter the inference from the vote or extend the intent evinced by it.    The effect of the vote remains simply, that a convention shall be called.    The elector expressed no power to be conferred.    The total vote evinced no common terms, and certainly none that the power to be transferred to the convention when called and organized should be that of absolute will, without ratification or approval.    This is tested by a very simple and practical question :  Did the people, when they voted to call a convention, *intend* to strip themselves of the power to ratify or reject the work of their servants ?    If so, where is the evidence of this intent ?    Every elector knows as a fact no such proposition was made to him.    On the question of power, the minds of the people met on no common ground of intent.    The desire of one was not that of another, and a third may have differed from both.    Therefore to *impute* absolute sovereignty of will to the convention to be called, from the vague and inexpressive implication of the vote on the question of calling a convention, is to assume a grant where none exists, or can be fairly inferred, compatibly with the rights and liberties of the people.    Its effect is to declare the impotency of the people, and the absolute potency of their agents.    It is to determine a question of authority against the principal, and in favor of the agent or servant, without any evidence of an intention to transmit the power.

The people have the same right to limit the powers of their delegates that they have to bound the power of their representatives. Each are representatives, but only in a different sphere.    It is simply evasive to affirm that the legislature cannot limit the right of the people to alter or reform their government.    Certainly it cannot.    The question is not upon the power of the legislature to restrain the *people*, but upon the right of the people, by the instrumentality of the law, to limit their delegates.    Law is the

[Woods's Appeal.]

highest form of a people's will in a state of peaceful government. When a people act through a law the act is theirs, and the fact that they used the legislature as their instrument to confer their powers makes them the superiors and not the legislature. The idea which lies at the root of the fallacy, that a convention cannot be controlled by law is, that the convention and the people are identical. But when the question to be determined is between the people and the convention, the fallacy is obvious. Such a metonymy may do for a flourish of rhetoric but not for grave argument. The parties to the question are the people on the one hand and the convention on the other. The people allege an usurpation of power in this, that the convention seeks to bind them without their ratification. The question then is, *what* power was conferred? The judiciary sits to decide between them. The people having challenged their power to set a government over them at will, the agents must show their authority to do this. The latter put in evidence the Act of 1871, as their authority. Then the issue is, does the Act of 1871, simply ordering a convention to be called, confer this absolute, extraordinary and dangerous power upon a body of men not yet called into being, and which can have neither being nor power except by the further act of the people through the instrumentality of a law? To make the law odious, it is assumed that the legislature is or may be corrupt. But this is aside from the true question of power. In a governmental and proper sense, *law* is the highest act of a people's sovereignty, while their government and constitution remain unchanged. It is the supreme will of the people expressed in the forms and by the authority of their constitution. It is their own appointed mode through which they govern themselves, and by which they bind themselves. So long as their frame of government is unchanged in its grant of all legislative power, these laws are supreme over all subjects unforbidden by the instrument itself. The calling of a convention, and regulating its action by law, is not forbidden in the constitution. It is a conceded *manner*, through which the people may exercise the right reserved in the bill of rights. It falls, therefore, within the protection of the bill of rights as a very manner in which the people may proceed to amend their constitution, and delegate the only powers they intend to confer, and as the means whereby they may, by limitation, defend themselves against those who are called in to exercise their powers. The legislature may not confer powers by law inconsistent with the rights, safety and liberties of the people, because no consent to do this can be implied, but they may pass limitations in favor of the essential rights of the people. The right of the people to restrain their delegates by *law* cannot be denied, unless the power to call a convention by law, and the right of self-protection, be also denied. It is, therefore, the right of the people and not of the legislature to be put by law above the con-

[Woods's Appeal.]

vention, and to require the delegates to submit their work for rati-
fication or disapproval.

To argue a want of authority in the law from the alleged char-
acter of those who passed it is bad logic, and an undeserved re-
proach, in view of the liberality of the subsequent Act of 1872,
which opened a wide door to men of all parties, and filled the con-
vention with the best men in the state.   When it is conceded that
a convention can be called and organized by law, the number and
qualifications of the delegates prescribed, their districts defined,
their mode of selection or appointment determined, their time and
place of meeting fixed, and their compensation declared by law,
the *binding force* of law must be conceded.   The convention was
a creation of law, and its members the offspring of law—fifty by
the mere force of law, without a popular election.   How, then, can
the power of law be denied?   Without it no delegates had existed,
and no power had been transmitted to them.   It is a solecism and
a fallacy to assert that a law has the power to transmit the autho-
rity of the people, and yet is a nullity in the terms of its trans-
mission.   If the authority of the people passes to the convention
outside of the law, the people are left without the means of self-
protection, except by revolution.   Then the singular spectacle is
presented of the absolute sovereignty of the people being vested
in a body of agents without any known means of transmission or
of limitation.   But clearly this cannot be when the fundamental
rights of the people are at stake.   To estop them from their right
to accept or reject the work of the convention, there must be an
evident channel pointed out through which their power passed to
the convention to ordain at pleasure a constitution or binding ordi-
nances.   The force of the argument cannot be avoided by refer-
ence to the well-known purity of character of the delegates.   The
*personnel* of the convention has nothing to do with the question
of delegated power.   It may help to suppress an inquiry into the
power, but, however presently popular the doctrine of self-imputed
sovereignty may be to those whose integrity forbids intentional
wrong, as a question of power the doctrine is unfounded in prin-
ciple, repugnant to right reason, incompatible with safety, danger-
ous to liberty, and unsuited to times of agitation and excitement
which sometimes overcome the people.

No argument for the implied power of absolute sovereignty in a
convention can be drawn from revolutionary times, when necessity
begets a new government.   Governments thus accepted and rati-
fied by silent submission afford no precedents for the power of a
convention in a time of profound tranquillity, and for a people
living under self-established, safe institutions.   While conventions
are well-known historical modes of procedure in the formation of
constitutions, they prove nothing; for history does not define their
powers or estop the people from asserting their own.   There can

[Woods's Appeal.]

be no estoppel by precedent against the fundamental rights of the people. Limits must be set to power. Liberty demands absolute security. No people can be safe in the presence of a divine right to rule or of self-imputed sovereignty in their servants to bind them without ratification.

Nor is the improbability of a wrong use, or an abuse of power, a sound argument in the light of our own knowledge. We have seen a public sentiment formed and elections carried in a few months, and yet the subject of excitement was as short-lived as it was sudden. Men have been proscribed for religion's sake and for a foreign birth. Moving like a whirlwind, such excitements have filled a legislature with its partisans. In our day, conventions, imputing sovereignty to themselves, have ordained secession, dragged states into rebellion against the well-known wishes of their quiet people, and erected in the midst of the nation alien state governments and a Southern Confederacy. The negro is now a citizen and an elector, and yet the time is not long gone by since the word "white" was voted by a former convention into the article on elections. Who can foretell the next subject of agitation? The times abound in contests. Labor and capital are in strife. Agriculture wars on transportation. Communism, international-ism, and other forms of agitation excite the world. Let conven-tions in such seasons possess, by mere imputation, all the powers of the people, and what security is there for their fundamental rights? Not the bill of rights, nor even the particular sentiment that brings the convention into existence. Once assembled, a con-vention, according to this dogma, is all powerful, and may annul any declaration in the bill of rights, and proclaim a constitution without let or hindrance. Who will predict what effects may be produced by combinations foreign to the purpose which actuated the call? The fundamental rights of the people, the true prin-ciples of civil liberty, the nature of delegated power, and the liabil-ity of the people to temporary commotion, all rise up in earnest protest against such a doctrine of imputed sovereignty in the mere servants of the people.

Then look at the constitution of the body to which this power may be imputed. The number may be any designated in the law, 133, thirty-three or three times three. The delegates may not be chosen by the whole people, but by portions of the people of one party, as under the Act of 1872. On what principle of sound reason or logical deduction does such a body possess, by mere im-putation, all the powers of the people, not conferred on them by law? They possess them by no act of the people independently of law. And certainly there is no popular *afflatus* outside of the law to breathe into them the spirit of prophecy in the name of the people.

In conclusion, we find nothing in the Bill of Rights, in the vote

[Woods's Appeal.]

under the Act of 1871, or the authority conferred in the Act of 1872, nothing in the nature of delegated power, or in the constitution of the convention itself, which can justify an assumption that a convention so called, constituted, organized and limited, can take from the people their sovereign right to ratify or reject a constitution or ordinance framed by it, or can infuse present life and vigor into its work before its adoption by the people.

Decree affirmed.