No. 12260

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

_____

THE STATE OF MONTANA, ex rel.
OSCAR S. KVAALEN,

                Relator,

    -vs-

LEO GRAYBILL, JR., JOHN TOOLE, DOROTHY ECK,
et al., as Members of and comprising a Committee
purporting to act pursuant to Resolution No. 14
of the Montana Constitutional Convention, et al.,

                Respondents.

_____

ORIGINAL PROCEEDING:

Counsel of Record:

    For Relator:

        Risken and Scribner, Helena, Montana.
        A. W. Scribner argued, Helena, Montana.
        Amicus Curiae
        Philip W. Strope argued, Helena, Montana.
        Joseph P. Monaghan, Butte, Montana.

    For Respondents:

        Harrison, Loendorf and Poston, Helena, Montana.
        Jerome T. Loendorf argued, Helena, Montana.
        Marshall Murray argued, Kalispell, Montana.
        Ben E. Berg argued, Bozeman, Montana.
        Thomas F. Joyce appeared,Butte, Montana.
        Hon. Robert L. Woodahl, Attorney General, Helena,
         Montana.
        John Connor, Assistant Attorney General, argued,
         Helena, Montana.
        Lawrence D. Huss, Deputy Attorney General, appeared,
         Helena, Montana.

_____

Submitted: April 18, 1972

Decided: APR 2 8 1972

Filed: APR 2 8 1972

_Thomas J. Kearney_
           Clerk

PER CURIAM:

This is a class action by taxpayers seeking a declaratory judgment and injunctive relief against nineteen Constitutional Convention delegates comprising its voter education committee, the state auditor, and the state treasurer. Relator, by an original proceeding in this Court, seeks (1) a judgment that the voter education committee has no right or authority to receive, expend, or obligate any public funds for voter education purposes, and (2) an injunction prohibiting the committee from receiving, expending, or obligating public funds for such purposes.

The factual background of this controversy will illuminate the legal issues before the Court in this proceeding. The Constitutional Convention was duly convened pursuant to the provisions of the Montana Constitution (Art. XIX, Sec. 8); this Court's decision in Forty-second Legislative Assembly v. Lennon (156 Mont. 416, 481 P.2d 330); and the Constitutional Convention Enabling Act of the Forty-second Legislative Assembly (Chapter 296, 1971 Session Laws, as amended by Chapter 1 of the Laws of the First Extraordinary Session of the Forty-second Legislative Assembly). Also to be noted is our decision in Mahoney v. Murray, _____Mont._____, _____P.2d_____, 29 St.Rep.289, a companion case. Its plenary session commenced on January 17, 1972 and continued until noon on March 24, 1972, when it "adjourned sine die".

Prior to adjournment sine die, the Constitutional Convention in plenary session adopted Resolution 14 which is the focus of the present controversy. This Resolution adopted on March 16, 1972, was quoted in Mahoney and is herewith set out again in full:

"WHEREAS, The Montana Constitutional Convention has nearly completed its substantive activities and is making arrangements for adjournment sine die in order to meet its election date commitment of June 6, 1972; and

"WHEREAS, prior to adjournment sine die the Convention will not be able to complete its procedural, administrative and voter education affairs, all of which must be concluded in an orderly and responsible manner; and

"WHEREAS, the Convention anticipates that it will need to establish an appropriate committee to manage and conclude all of its procedural, administrative and voter education affairs after adjournment sine die;

"NOW, THEREFORE, IT IS RESOLVED BY THE CONSTITUTIONAL CONVENTION OF THE STATE OF MONTANA AS FOLLOWS:

"1. The Convention hereby creates a committee to act with the President of the Convention on its behalf after adjournment sine die, delegating to it full authority to manage and conclude all of the Convention's procedural, administrative and voter education affairs, and to spend the Convention's funds therefor, but only within the limits of its appropriation and such other funds as the Convention may have.

"2. The Convention hereby appoints to said committee the President, Leo Graybill, Jr., who shall act as its chairman, and the following delegates: John Toole, Dorothy Eck, Bruce Brown, Jean Bowman, Margaret Warden, Fred Martin, Robert Vermillion, Katie Payne, Betty Babcock, Marshall Murray, Catherine Pemberton, John Schiltz, Thomas Joyce, George Harper, Bill Burkhardt, Jerome Loendorf, Oscar Anderson, Gene Harbaugh.

"3. No delegate may serve on the committee who shall seek public office in the primary election to be held on June 6, 1972. The President, as chairman of the committee, shall have authority to substitute other Convention delegates for any committee members named herein who may decide to seek public office.

"4. The Convention hereby delegates authority to the committee to receive, disburse and account for all Federal funds which the Convention may receive.

"5. The Convention also delegates authority to the committee to supervise and edit any and all voter education materials prepared on behalf of the Convention or by other persons relative to the work of the Convention.

"6. The committee shall terminate its work at such time as all of the Convention's procedural, administrative and educational affairs have been completed, and all requirements of the Enabling Act have been met."

Although the exact amount the committee proposes to expend for voter education purposes cannot be precisely computed at this time, it is clear that the voter education committee proposes to receive and expend approximately $45,000 and that some of these public funds have already been spent or obligated. The source of this $45,000 is $15,000 in anticipated unexpended funds appropriated to the Convention by the 1971 Legislative Assembly, plus a $30,000 HUD grant of federal funds for the purpose of providing financial assistance to the Montana Constitutional Convention.

It should also be noted that the 1971 Legislative Assembly appropriated the sum of $41,000 to the secretary of state "for the elections relating to the constitutional convention". The sum of $24,000 from this appropriation has been budgeted for voter information concerning the proposed constitution, with comments and report to the people pursuant to the requirements of subsections (4) and (5), Section 17, of the Constitutional Convention Enabling Act and Resolution 11 of the Constitutional Convention.

Section 17(4) of the Constitutional Convention Enabling Act provides:

> "Each proposed revision, alteration, or amendment, together with appropriate information explaining each revision, alteration, or amendment, shall be published in full and disseminated to the electors upon adjournment of the convention but not later than thirty (30) days preceding the election and in such manner as the convention prescribes."

Section 17(5) of the Constitutional Convention Enabling Act reads:

> "The convention shall also publish a report to the people explaining its proposals."

Resolution 11 of the Constitutional Convention provides in pertinent part:

"Section 2. (1) The Secretary of State is hereby requested to requisition the Purchasing Division of the Department of Administration to call for bids for the printing of the proposed Constitution with comments and report to the people as required by subsections (4) and (5) of Section 17 of the Constitutional Convention Enabling Act, which shall be printed in the form prescribed by the Convention."

Attached to Resolution 11 is a requisition form prescribing the form, number of copies, and distribution of the copies required.

Pursuant to the foregoing authority, the secretary of state has caused to be printed and distributed 400,000 copies of the proposed constitution with comments and report to the people. The costs incurred to date for this item are $12,016.89. This publication is similar in size to the family supplement contained in the Sunday editions of our daily newspapers, consists of 24 pages, in color, and contains the following: sample ballot; history and highlights of the proposed constitution; the proposed constitution with comments; the preamble; the verbatim provisions of the proposed constitution, article by article with comments, and a comparison with the existing constitution indicating what provisions are retained from the present constitution and what new provisions have been added in the proposed constitution; a transition schedule from the present constitution to the proposed constitution in the event the latter is approved by the people at the constitutional referendum election; the adoption schedule; deletions from the present constitution in the proposed constitution; the officers and delegates of the Constitutional Convention by districts with mailing addresses; and the places where additional copies of the publication can be secured.

Relator does not attack the expenditure of public funds by the secretary of state for publication and distribution of

this publication for voter information. Relator's attack is directed solely at expenditures of public funds by the voter education committee for employing an advertising agency, newspaper advertisements, radio and television programs, production and distribution of a 15-minute film on convention activities and proposals relative to the proposed constitution, a slide presentation, administrative expenses, and other voter education expenditures.

The original proceeding now before this Court was filed by relator Oscar S. Kvaalen on April 7, 1972, with supporting brief. It is a class action by relator on behalf of Montana citizens and residents who are payers of state taxes against nineteen Constitutional Convention delegates who comprise the voter education committee of the Constitutional Convention pursuant to Convention Resolution 14. The state auditor and state treasurer, whose official duties encompass the expenditure of public funds, are named as nominal defendants.

Relator seeks a declaratory judgment of this Court that:

(1) The powers and authority of the Constitutional Convention became functus officio and ceased to become effective upon its adjournment sine die at noon on March 24, 1972;

(2) Resolution 14 of the Constitutional Convention is in excess of the Convention's jurisdiction and power, and is illegal insofar as it purports to delegate to the voter education committee any powers or authority of the Convention;

(3) The voter education committee has no right, standing, power, or authority to receive or expend any federal funds received for the purposes of the Convention;

(4) The voter education committee has no right, standing, power or authority to incur liabilities or obligate state or federal funds for any purpose whatever;

(5) It is unlawful to incur liabilities or obligations from state or federal funds for the purpose of advertising, publicizing, or promoting the work of the Convention; attempting to promote voter approval of the proposed constitution; or attempting to influence the outcome of the proposed constitution referendum election.

Relator also seeks ancillary relief by injunction prohibiting the voter education committee, the state auditor and the state treasurer from receiving or expending public funds for voter education activities of the committee.

Following ex parte oral argument on behalf of relator, this application was set for adversary hearing before this Court on April 18, 1972, and appropriate notices of this hearing were directed to be given to the parties and to the attorney general.

Prior to such adversary hearing, the members of the voter education committee of the Constitutional Convention filed their answer. In substance it admitted the facts contained in relator's application, but denied the committee was doing or proposed to do anything unlawful, or that the committee was exceeding its powers or authority. The committee filed an extensive documentation of the proceedings of the Convention and the committee's own proceedings, together with a brief of legal authorities supporting its activities.

A brief was also filed by the attorney general on behalf of the state auditor and state treasurer, the import of which was that these officials have no interest in the substantive merits of this controversy and stand ready to abide by any decision rendered by this Court herein.

Additionally, an amicus curiae brief was filed by Joseph P. Monaghan, a Butte attorney, supporting an equal division of

public funds left over from the Constitutional Convention between advocates and opponents of the proposed constitution. We need not discuss this because (1) amicus curiae cannot raise separate issues not raised by the parties, and (2) our holding here, as hereafter appears.

Prior to the adversary hearing, written interrogatories were propounded to Leo Graybill, Jr., president of the Constitutional Convention and chairman of the nineteen delegate voter education committee and written answers were filed by him. From these interrogatories and answers, it appears the voter education committee has adopted a proposed budget of $45,657 for voter education purposes consisting of $30,650 for film, television time, television spots, radio advertising, newspaper advertising, slides, and citizen participation; the remaining $15,007 is budgeted for administrative expenses consisting of staff wages, employee benefits, postage, telephone, supplies, printing, contracted services for use of a Xerox machine, etc., and travel. The source of the funds for payment of the budgeted amounts is $15,000 from the Constitutional Convention appropriation, and an anticipated $30,000 from a federal HUD grant for which the contract is not yet signed nor the grant finalized, and which is contingent on the $15,000 state matching funds from the Constitutional Convention appropriation.

As far as we can determine from the record before us, this anticipated $15,000 in unexpended funds appropriated to the Convention to be used as state matching funds may be more fictitious than real. In order to arrive at this surplus, it appears that the Convention must ignore the $18,000 deficit of the Constitutional Convention Commission established under the same Enabling Act, which will have to be paid from taxpayers' funds by deficit appropriation or otherwise. Also it appears that the cost of printing and distribution of the 400,000 copies

of the proposed constitution with comments and report to the people required of the Convention by Sections 17(4) and 17(5) of the Enabling Act is to be paid from the secretary of state's budget and appropriation and not the Convention's budget and appropriation. This item has been budgeted at not to exceed $24,000 of which $12,016.89 has already been spent. We mention these matters simply to show that, at least on the record before us, this anticipated surplus appears to be the result of a bookkeeping transaction producing a "paper surplus" in the Convention's own budget and appropriation.

Referring now to the anticipated $30,000 from a federal HUD grant, heretofore mentioned, apparently as of March 24, 1972, the date of adjournment, the State Department of Planning and Economic Development had a verbal commitment from the Denver Regional office. A contract apparently between a state agency, the Constitutional Convention operating through its committee under Resolution 14, and the federal government is still to be negotiated. The machinations of this contractual relationship are not clear. It only serves to point up the continuing nature of the Convention's activities after adjournment sine die.

The interrogatories and answers further disclose that the staff consists of two full-time employees, a coordinator and a secretary receiving $30 and $22.50 per day respectively, whose term of employment will run to the date of the election, June 6, 1972; a part-time employee performing bookkeeping and financial services two days a week at $30 per day, whose term of employment will likewise terminate on June 6, 1972; and a temporary secretarial replacement paid $20.78 per day, whose duration of employment is not indicated. The voter education committee has also engaged by contract the services of an advertising agency which is to be paid for time spent at its

scale per hour which is estimated at $2,500, with about half its services already performed. It is unknown at this time whether the voter education committee will engage the services of other persons or organizations to assist in its activities. The advertising agency has earned and billed to date the sum of $4,844.71 for film and $405.60 for slides, which is unpaid. Various other sums in an undetermined amount may be due for partially completed work. The voter education committee anticipates spending approximately $30,000 on media and services through the advertising agency.

The adversary hearing on relator's application was held before this Court on April 18, 1972. Oral argument was heard on behalf of relator, amicus curiae Philip W. Strope, the attorney general, and the respondent voter education committee. Following hearing, the case was taken under advisement by this Court.

The ultimate issue to be determined in the instant case is whether the voter education committee of the Constitutional Convention can receive and expend public funds for voter education in connection with the forthcoming referendum election on approval or rejection of the proposed constitution. Two underlying issues control: (1) Can the Constitutional Convention delegate its powers and authority to a committee and empower that committee to exercise such delegated powers and authority following the Convention's adjournment sine die? (2) Does the Constitutional Convention itself have the power and authority to receive and expend public funds for voter education?

Summarizing the basic contentions of the parties, we note that relator argues the Constitutional Convention cannot act through a committee after the Convention has adjourned sine die because (1) such delegated powers can last no longer than the powers of the delegating authority, and (2) the Convention's

power and authority must be exercised by the Convention itself and cannot be delegated to a committee. Relator further contends that the Constitutional Convention itself was granted no power and authority concerning voter education and particularly in regard to expenditure of public funds for this purpose, and accordingly the expenditure of public funds for this purpose is unlawful.

Respondent members of the voter education committee, on the other hand, contend that the Constitutional Convention possesses plenary power to carry its product to the people; that voter education concerning the proposed constitution and the expenditure of public funds therefor is necessary and desirable to accomplish this purpose as determined by the Convention; and that the power and authority of the Convention in this respect was duly delegated to the committee by Resolution 14. Respondent committee members further argue the Constitutional Convention has the authority to conclude its ministerial, administrative, and procedural affairs after its adjournment sine die, and this can be done through a committee empowered by the Convention to accomplish these activities, which include voter education on the proposed constitution and the expenditure of public funds for this purpose.

We note that some of the arguments of the parties herein have been laid to rest by our decision in Mahoney, the companion case, which we handed down three days after oral argument in the instant case. In Mahoney, we held that a Constitutional Convention delegate's term of office runs until repeal of the Constitutional Convention Enabling Act on June 30, 1973, and accordingly such delegate was not eligible to file for another public office this year. Our decision in Mahoney was based on the Montana Constitution, the Constitutional Convention Enabling Act, the

case of Forty-second Legislative Assembly v. Lennon, 156 Mont. 416, 481 P.2d 330, and Resolution 14 of the Constitutional Convention. We held in Mahoney that although the adjournment sine die of the Convention terminated its function of proposing revisions, alterations or amendments to the Constitution, all other powers of the Convention continued thereafter. Accordingly, we have omitted the arguments of the parties in the instant case bottomed on the proposition that all powers and authority of the Convention expired upon its adjournment sine die; that the office of Convention delegate terminated simultaneously transforming each from a public officeholder to a private citizen; and that a committee of private citizens was prohibited from receiving or expending public funds.

Directing our attention the first underlying issue for review, noted above, we hold that our decision in Mahoney answers relator's contention that the committee's delegated powers can last no longer than the powers of the Convention, the delegating authority. In Mahoney, we held that all powers of the Convention, other than the power to propose revisions, alterations or amendments to the Constitution, continued after the Convention's adjournment sine die. Accordingly, relator's argument fails.

We hold, however, that any power and authority the Convention may possess to receive and expend public funds for voter education purposes must be exercised by the Convention itself and may not be delegated to a committee. All state funds were appropriated to the Convention by Section 21 of the Constitutional Convention /Enabling Act. After adjournment of the Convention sine die, neither the state of Montana or any state agency possessed the absolute control over the appropriation required by Montana Constitution, Art. V, Sec. 35, which provides in pertinent part:

"No appropriation shall be made for * * * educational * * * purposes to any person * * * not under the absolute control of the state * * *."

It may be argued that because the committee is composed of Constitutional Convention delegates who hold public office until repeal of the Constitutional Convention Enabling Act on June 30, 1973, the required "absolute control of the state" over the appropriation exists. Likewise it may be argued that the state possesses such "absolute control" by reason of the power of state officers and agencies to deny purchase requests from such appropriations, to disapprove expenditures from such appropriations, and to refuse payment therefor. But does such "absolute control of the state" over the appropriation exist under the facts here? Not at all. The power and authority delegated to the committee under Resolution 14 is "full authority to manage and conclude all of the Convention's procedural, administrative and voter education affairs, and to spend the Convention's funds therefor" within the limits of its appropriation; "to receive, disburse and account for all Federal funds which the Convention may receive"; and "to supervise and edit any and all voter education materials prepared on behalf of the Convention or by other persons relative to the work of the Convention". The receipt and expenditure of public funds derived from the state and federal government for voter education is delegated to the committee without substantial guidelines, other than that "money budgeted for public information" shall not be expended for "anything but factual reporting of the proceedings of this convention". Other than this limitation the committee is free to expend these funds as it sees fit for voter education activities under Resolution 14.

The presumption of regularity attaches to the committee's acts and expenditures under Section 93-1301-7(15), R.C.M. 1947,

- 13 -

which provides a statutory presumption "That official duty has been regularly performed." The state auditor and the state treasurer indicate they will act on this presumption of regularity in connection with their own official functions concerning public funds, absent a contrary ruling by this Court. Under the circumstances disclosed here, the required "absolute control by the state" over its appropriation of public funds is purely fictitious.

Respondent committee members cite State ex rel. James v. Aronson, 132 Mont. 120, 314 P.2d 849, as authority that the committee can conclude the Convention's ministerial, administrative and procedural affairs after the Convention adjourns sine die. We are not concerned here with the administrative and procedural matters to conclude the Convention duties through the election held. Rather, we are concerned with "voter education" contemplated by Resolution 14 which obviously involves the discretion of the committee. Therefore, James is not applicable here.

Thus we hold that under the facts here, the Convention cannot delegate to a committee whatever power and authority it possesses to receive and expend public funds for voter education purposes to be exercised by the committee after the Convention's adjournment sine die.

Proceeding to the second underlying issue in this case, respondent committee members claim that aside from the question of delegation of the Convention's power and authority, the Convention has the power to take its product, the Convention's proposed constitution, to the people, and to receive and expend public funds for voter education to this end. The source of this

power, they argue, is plenary arising from the Montana Constitution, Article XIX, Sec. 8; the Constitutional Convention Enabling Act, Sections 9, 17(4) and 17(5); and the Convention's inherent plenary power and authority.

Article XIX, Sec. 8 provides, in part, that the Convention shall meet within three months after the election of delegates and prepare such revisions, alterations, or amendments to the Constitution as may be deemed necessary, which shall be submitted to the electors for their ratification or rejection at an election appointed by the Convention for that purpose, to be held not less than two nor more than six months after Convention adjournment. We find nothing in this provision granting any authority, express or implied, to the Convention to expend public funds for voter education. The power or duty to hold an election does not, in itself, imply a corresponding power to educate the voters and expend public funds therefor.

Section 9 of the Enabling Act provides that the Convention "may make such other expenditures as it deems proper to carry out its work". Section 17(4) provides that each proposed revision, alteration, or amendment, together with appropriate information explaining the same, shall be published in full and disseminated to the electors upon adjournment of the Convention not later than 30 days preceding the referendum election in such manner as the Convention prescribes. Section 17(5) provides that the Convention shall also publish a report to the people explaining its proposals.

We do not construe Section 9 of the Enabling Act to grant carte blanche power to the Convention to expend public funds for voter education purposes. If the Convention's work does not encompass voter education, Section 9 does not authorize such expenditure of public funds; nor is there any grant of power in the field of voter education contained in this provision. We must look elsewhere for such power if it exists.

The provisions of Sections 17(4) and 17(5) of the Enabling Act are satisfied by the printing and distribution by the secretary of state of 400,000 24-page, tabloid size, color reproductions of the proposed constitution, a comparison with the present constitution, appropriate comments, explanations, and voter information including a sample ballot, as previously noted. This was printed and distributed by the secretary of state pursuant to Convention resolution, was paid for from public funds appropriated by the legislature to the secretary of state, and constitutes compliance with voter information requirements of the Enabling Act, contained in Sections 17(4) and 17(5).

Finally the Convention claims inherent plenary power of voter education, including the expenditure of public funds for that purpose. It cites the 1945 Missouri case of State ex rel. News Corporation v. Smith, 353 Mo. 845, 184 S.W.2d 598, as authority for this view. That case holds a constitutional convention with power to submit its work to the voters has the power to appoint a committee of the convention, who in reality are agents of the state or of the public, to supervise the expenditure of public money legally appropriated for convention purposes. This decision is contrary to the facts here and can be explained in terms of a practical decision to enable the state to pay a just bill for publication of an "Address to the People" adopted by the convention. The logic of this decision on any other grounds escapes us, and it is not persuasive in the instant case under our facts and law.

There is some authoritative support for the doctrine of inherent, plenary, and sovereign power of a constitutional convention; however it is derived from early cases during the American Revolution and in the reconstruction era following the Civil War where there was no effective or established government to supervise the work of the convention. In our view,

this doctrine is not applicable to present conditions where, as here, the constitutional convention is called pursuant to the provisions of an existing constitution, and by enabling legislation enacted thereunder. See Dodd, The Revision and Amendment of State Constitutions,p. 92; Hoar, Constitutional Conventions, p. 166. Even in situations where the existing constitution provided no means for calling a constitutional convention, the Pennsylvania court refused to apply this doctrine of inherent plenary power. Woods's Appeal, 75 Pa. 59 (1874); Wells v. Bain, 75 Pa. 39 (1874).

Accordingly, we hold that the Constitutional Convention itself possesses no power or authority to receive or expend public funds for voter education beyond the specific requirements and authority found in the Enabling Act; that these requirements in the Enabling Act have already been satisfied; and that the Convention lacks power or authority to receive or expend further public funds for voter education in the manner proposed by the committee.

The additional arguments of respondent committee that public policy supports a decision in its favor, and that the intent of the framers of the 1889 Constitution supports post adjournment voter education do not merit extended discussion. The public policy argument is valid to the extent that the legislature has enacted a public policy of voter education and expenditure of public funds therefor; but to the extent the legislature has so provided, the Convention has already completed its duties of voter information, as heretofore set forth. The argument that the intent of the framers of the 1889 Constitution supports post adjournment voter education is drawn from tenuous, and perhaps nonexistent, facts. We find nothing in the cited convention

proceedings supporting respondent's conclusion.

We wish to make it clear that this decision does not in any manner limit the right of any Constitutional Convention delegate to promote approval of the proposed constitution in any lawful manner. Emphasizing, so there may be no question about this holding, our decision is limited to proposed voter education activities of the committee acting under Resolution 14, and the further expenditure of public funds for voter education thereunder.

A declaratory judgment in favor of relator is hereby entered determining (1) the voter education committee has no lawful delegated authority to exercise any power and authority the Convention possesses regarding voter education and the expenditure of public funds therefor, and (2) the Constitutional Convention itself has no further power and authority concerning voter education or the receipt or expenditure of further public funds, state or federal, for such purposes. A permanent injunction is hereby granted against the nineteen members of the voter education committee, the state auditor, and the state treasurer enjoining further receipt or expenditure of public funds for voter education purposes.

By the Court:

_____
Chief Justice

_____

_____

_____

_____
Associate Justices.

- 19 -