Stander et al., Appellants, *v.* Kelley.

Argued January 6, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*James E. Beasley,* for plaintiffs, appellants.

*William C. Sennett,* Attorney General, with him *Edward Friedman,* Counsel General, for Secretary of Commonwealth, appellee.

*Ira P. Tiger, Ralph S. Snyder, Samuel D. Slade, Bernard G. Segal,* and *Schnader, Harrison, Segal & Lewis,* for amicus curiae.

*S. Regen Ginsburg* and *Lewis H. VanDusen, Jr.,* for amicus curiae.

*W. J. Krencewicz,* for interested person, under Rule 65.

OPINION BY MR. CHIEF JUSTICE BELL, February 7, 1969:

On April 23, 1968, the eligible voters of Pennsylvania adopted several amendments to the Constitution of Pennsylvania. Included among these was a complete revision of Article V relating to the Judiciary. The vote approving the new Judiciary Article, which superseded the old Judiciary Article, was 910,855 in favor and 729,845 against.

The plaintiffs, taxpayers and owners of real estate in Pennsylvania, on April 11, 1968 filed a taxpayers' Complaint in Equity against the Secretary of the Commonwealth in the Dauphin County Common Pleas Court, in which the Court was asked to enjoin a vote by the electorate on the new proposed Constitutional Amendments and to hold them invalid and void.

The plaintiffs, on April 11, 1968, had originally attempted to obtain a preliminary injunction which sought to enjoin the Secretary of the Commonwealth from printing the questions pertaining to the Constitutional amendments on the ballots to be furnished the electors at the April 23, 1968 election. The Dauphin County Common Pleas Court refused to grant the *preliminary* injunction, principally on the basis of the plaintiffs' laches* in waiting until the "eve" of the election to bring their action. An appeal was taken to this Court, which affirmed the dismissal of the preliminary injunction on the ground that the Court below had not committed a clear abuse of discretion or a palpable error of law: *Stander v. Kelley*, 432 Pa. 1, 246 A. 2d 649. An amended complaint was thereafter filed seeking permanent equitable relief. This too was denied by the Dauphin County Court and its Order dismissing the complaint and entering a decree in favor of the defendant serves as the basis for the present appeal.

Because of the tremendous importance of this question to all the people of Pennsylvania, we shall first point out what questions are, and what questions are not involved, and then discuss several of the contentions made by the Commonwealth and all of the prin-

---

* The proposed amendments were first advertised in the first week of April (April 5), 1968. The plaintiffs brought a bill to enjoin the election on April 11, 1968, which under all the facts did not constitute laches.

cipal contentions made by the appellants.* The broad question involved is whether the new Judiciary Article V, which in practical effect repealed Article V of the Constitution of 1874, is Constitutional or is null and void. It is unnecessary at this time and in this case to unravel the conflicts or to interpret the many ambiguities which exist in the new Judiciary Article, or the wisdom or foolishness of any of its provisions. Speaking more specifically, the questions involved are: Was the new Judiciary Article adopted by the people without violating the existing Pennsylvania Constitution of 1874, or the Constitution of the United States, or any pertinent Act of the Legislature?

### Justiciability

The Commonwealth contends that none of the questions raised by appellants nor the Constitutionality of the new Judiciary Article itself is justiciable, because the ultimate sovereign power of our Government reposes in the people and the people have approved by their vote the new Judiciary Article. The Attorney General supports this position by a reference to *Woods's Appeal*, 75 Pa. 59; *Wells v. Bain*, 75 Pa. 39; *Armstrong v. King*, 281 Pa. 207, 126 Atl. 263; *Taylor v. King*, 284 Pa. 235, 130 Atl. 407.

In *Taylor v. King*, 284 Pa., supra, the Court considered a mandamus action to compel the Secretary of the Commonwealth to advertise a proposed Constitutional Amendment. The Court said, inter alia (page 239):

"The Constitution of the State may be legally amended in the manner specifically set forth therein, *or a new one may be put in force by a convention duly assembled, its action being subject to ratification by*

---

* Briefs of the parties and of the amici curiae totaled, exclusive of the voluminous exhibits, 220 pages.

*the people,*\* but these are the only ways in which the fundamental law can be altered. . . .

"There may be technical error in the manner in which a proposed amendment is adopted, or in its advertisement, yet, if followed, unobjected to, by approval of the electors, it becomes a part of the Constitution. . . ."

In *Armstrong v. King*, 281 Pa., supra, the Court held that the bonus amendment which had previously been submitted to and rejected by the people under the authority of Article XVIII of the 1874 Constitution could not again be submitted within the five-year period, and enjoined the officers of the Commonwealth from advertising the proposed amendment. The case is well stated in the Syllabus (page 207) : "5. Where such proposed amendment has been adopted by two successive legislatures, has been approved by a majority of the electors, has been acted upon by those charged with administration under it, and public or private rights would be injuriously affected by setting it aside, it is too late to do so, even by a direct attack on the ground that it was submitted for approval at the wrong time, and it cannot then be collaterally attacked for any reason." The Court said (page 214) : "Under what circumstances, if any, a direct attack can be made on a constitutional amendment, after adoption by the people, because of a failure to comply strictly with some procedural condition leading up to the submission, has been the subject of many and lengthy opinions, with results impossible of reconciliation." Although unnecessary to the result reached, the Court again approved the calling of a Convention to amend the Constitution of this Commonwealth if approved by vote of the people, and stated that mere errors of procedure would not invalidate the vote of the people.

---

\* Italics, ours.

412

The Attorney General contends that the aforesaid cases hold that the Constitutionality of a Constitutional amendment can be challenged in the Courts *before* its approval by the electorate, *but never after.* Although some language in these cases may support the Commonwealth, this Court nevertheless did take jurisdiction and considered the questions raised.

: *Woods's Appeal,* 75 Pa., supra, contains some language, as do the cases above, which supports the Attorney General's contention that a Constitutional amendment can be challenged in the Courts *before* its approval by the electorate *but never after.* Assuming these cases are apposite, if they hold as the Commonwealth contends, the foolishness of such a holding in the present era is obvious. If there is a palpable violation or violations of the existing Constitution, the Commonwealth contends that that question or issue is *justiciable* if decided by the Courts one week or *one day prior* to the election, *but is not justiciable one day after* the people have voted to approve or adopt the Amendment, no matter how clearly the provisions of the existing Constitution may have been violated. Furthermore, under the theory of the Commonwealth, a trial Court or an appellate Court could unintentionally or intentionally enable a palpable violation or violations of the Constitution of Pennsylvania, or of the Constitution of the United States, to become Constitutional and nonjusticiable,* if, through an overload of work, or inadvertence, or laziness, or incompetence, or illness, or for any reason whatsoever it failed to render a decision before the question was approved by the vote of the people. However, the recent decisions of the Supreme Court of the United States are analogous and controlling. They expressly and specifically hold that (1) *a vote of the people* cannot validate and Constitution-

---

* Other jurisdictions (*State v. Holman,* 296 S.W. 2d 482; *Stovall v. Gartrell,* 332 S.W. 2d 256) have held to the contrary.

alize anything which violates a provision of the Constitution, and (2) *this question or issue of Constitutionality is justiciable after the voters have adopted such a provision*: *Baker v. Carr*, 369 U.S. 186; *Reynolds v. Sims*, 377 U.S. 533; *Wesberry v. Sanders*, 376 U.S. 1; *Lucas v. 44th General Assembly of Colorado*, 377 U.S. 713; *Jordan v. Silver*, 381 U.S. 415. Cf. *Hunter v. Erickson*, 393 U.S. 388, 37 L.W. 4091 (1969); cf. also *Butcher v. Bloom*, 420 Pa. 305, 216 A. 2d 457.

These cases demonstrate that Constitutionally ordained rights must and will be protected by the Courts against the will as well as against the vote of a majority of the people. In *Lucas v. 44th General Assembly of Colorado*, 377 U.S., supra, the Court pertinently said (pp. 736-737): "Courts sit to adjudicate controversies involving alleged denials of constitutional rights. . . . An individual's constitutionally protected right to cast an equally weighted vote cannot be denied *even by a vote of a majority of a State's electorate*,* if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. Manifestly, the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act. As stated by this Court in West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, *'One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.'** A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.** We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection

---

\* Italics, ours.

Clause, as delineated in our opinion in Reynolds v. Sims."

In *Jordan v. Silver*, 381 U.S. 415, the California Constitution reserved to the people of California the power to propose Constitutional amendments by filing a petition with the Secretary of State, signed by eight per cent of the persons who voted in the preceding gubernatorial election. The voters of California approved a plan to provide a Federal-type plan for the election of senators and representatives in California. The plan provided, inter alia, for a Senate composed of 40 members with detailed provisions for their senatorial districts. This plan was approved by a vote of the people, and three times thereafter the people voted against changing this apportionment system for the senatorial election. Notwithstanding the vote of the people, the Supreme Court held this senatorial apportionment and election by the people to be invalid under the Court's decisions in *Reynolds v. Sims*, 377 U.S., supra, and companion cases.

To summarize: It is a traditional and inherent power of the Courts to decide all questions of Constitutionality, and the recent decisions of the Supreme Court of the United States hold that alleged violations of the Constitution are justiciable even after they have been voted upon and approved by the people.

### The Use of the Constitutional Convention

On March 15, 1967, the Governor of Pennsylvania approved Act No. 2 of 1967 which provided for a limited Constitutional Convention. Appellants contend that this Constitutional Convention method was unconstitutional because Article XVIII of the 1874 Pennsylvania Constitution* sets forth in great detail the manner in which the Constitution of Pennsylvania may be

---

\* Article XVIII has since been renumbered by proclamation of the Governor as Article XI.

amended and contains no provision for the calling of a Constitutional Convention. Nevertheless, this Court has several times previously held that amendments to our prior and existing Constitution may be initiated by the calling of a Constitutional Convention, provided a majority of the electors vote in favor of such a call. Unmindful of the fact that the Constitution of 1874, which has been the framework of our State Government for over 90 years, was adopted by the convention method at a time when the amendatory provisions of the then existing Constitution did not prescribe a convention as a method for Constitutional change, appellants contend that nowhere in any Article or provision of the Constitution is there any authority for the calling of a Constitutional Convention for the purpose of permitting the people to amend the Constitution. Appellants also forget that the provisions for the adoption of the Constitution of the United States directly contravened Article XIII of the Articles of Confederation which were drawn up and submitted to the people through a Constitutional Convention, and that 12 of the original 13 State Constitutions contained no amendment provisions, yet all of them were amended from time to time by the Convention method. Appellants further contend that a failure to follow the clear and specific amendment provisions renders the new Judiciary Article invalid and void.

We reaffirm our prior decisions which have consistently held that so long as a Constitutional Convention is not expressly prohibited by the then existing Constitution, it represents a proper manner and method in which the citizens of Pennsylvania *may initiate* an amendment of their Constitution. *Taylor v. King*, 284 Pa., supra; *Armstrong v. King*, 281 Pa., supra; *Wells v. Bain*, 75 Pa., supra; *Woods's Appeal*, 75 Pa., supra; Article I, Section 2, of the 1874 Constitution of Pennsylvania.

## Conformity with the Constitutional Amendment Procedures

### 1. *Notice and Advertisement*

Article XI of the Pennsylvania Constitution of 1874, set forth above, provides that proposed amendments to the Constitution shall be published "three months" before being submitted to the people. In this case, notice of the amendment proposals were published on April 5, 1968, only eighteen days before the election. Appellants contend that the failure to give notice in accordance with Article XI renders the approved amendments illegal and void.

It is undoubtedly true that in matters relating to the alteration or amendment or change or abolition of the Constitution, which is the fundamental Law of our Commonwealth, all the clear and mandated provisions of the Constitution must be strictly followed and obeyed and no departures from or circumventions or violations of existing mandatory Constitutional amendment requirements will be permitted. *Commonwealth ex rel. Attorney General v. Beamish*, 309 Pa. 510, 164 Atl. 615. However, the appellants misconstrue what has taken place here. These new amendments to or revision of the Constitution were not adopted pursuant to the provisions of Article XI of the Constitution of 1874, but were adopted pursuant to and through a different manner of amendment—the Constitutional Convention. As we said earlier, this Court has declared that the convention method of amending the Constitution is lawful. Since, as we have above held, the electorate may employ the convention process for amending the Constitution, it follows that the people have the right to determine initially or by ratification the manner and matter of notice and times of publication which they desire or are willing to sanction. Act No. 2 of 1967

specifically provides: "The Secretary of the Commonwealth shall advertise the proposals of the convention in at least two newspapers of general circulation, if there are such, in every county of this Commonwealth once during the first week in April, 1968." The Secretary has complied with this direction or mandate and, accordingly, we hold that notice and advertisement was timely and adequate.

We further note that in both 1836 and in 1873 the existing provision of the Constitution with regard to advertising was not followed in the Act setting up the convention, and in the instant matter *the complete text* of the proposed Constitution was published on April 5, 1968, in 134 newspapers which were published and circulated throughout the entire Commonwealth.

2. *The Ballots*

Appellants also challenge the form of the notice of the proposed Constitutional amendments as it appeared on the ballots submitted to the electorate at the April 1968 primary election. The ballot question relating to the Judiciary Article amendment read as follows: "JU- DICIARY—Ballot Question V: Shall Proposal 7 on the JUDICIARY, adopted by the Constitutional Convention, establishing a unified judicial system, providing directly or through Supreme Court rules, for the qualifications, selection, tenure, removal, discipline and retirement of, and prohibiting certain activities by justices, judges, and justices of the peace, and related matters, be approved?"

It is obvious that this question as printed on the ballots is but a tiny and minuscular statement of the very lengthy provisions of the proposed Judiciary Article V. It is equally clear and realistic beyond the peradventure of a doubt that a lengthy summary of the proposed Judiciary Article could not have been printed on an election ballot. The first and most im-

portant question *on this point* is: Does the question as stated on the ballot fairly, accurately and clearly apprize the voter of the question or issue to be voted on? Our answer to this question is "Yes." In recognition of this right of the electorate to be clearly and more fully informed of the question to be voted on, the Legislature by Act No. 2 of 1967 required the Secretary of the Commonwealth to "also publish the Constitution showing the changes proposed by the convention in convenient form and send a copy thereof to each elector requesting it, and ten copies thereof through the County Board of Elections to each polling place for the use of the voters during the election." The Secretary of the Commonwealth complied with this mandate.

Appellants contend that the electorate had no more idea or knowledge of the "notice" requirements, or of the real question stated on the ballot than it knew what it was approving when it adopted the new Constitutional amendments in April of 1968. In a Republican or Democratic form of Government, a similar contention is made after almost every election—the people didn't know or did not understand what (or whom) they were really voting for. This generalization has never been proved and will not be assumed by us.

### Amendment More Than Once in Five Years

Article XVIII of the Constitution of 1874 and Article XI of the new Constitution provide: ". . . no amendment or amendments shall be submitted oftener than once in five years . . ." In 1965, an amendment to the Judiciary Article which pertained to the assignment by the Chief Justice of former Judges was submitted to and approved by the electorate. Appellants contend that an adoption of the new Judiciary Article

violates Article XVIII of the Constitution of 1874 and also of the specific provisions of the new Judiciary Article.

The amendments here in issue were, we repeat, not adopted pursuant to Article XVIII but were adopted in and by a different *lawful* manner. Furthermore, in *Commonwealth ex rel. Margiotti v. Lawrence*, 326 Pa. 526, 193 Atl. 46, this Court said (pages 534-535): " '. . . The clause "but no amendment . . . shall be submitted oftener than once in five years" . . . clearly *refers to such as has already been submitted** and rejected in light of the language used . . . it refers to an amendment that has been submitted before and rejected and not to one that was never before submitted.' " Accord, *Commonwealth v. King*, 278 Pa. 280, 122 Atl. 279.

The prior proposed amendments which were adopted by the people were different from the 1968 amendments to the new Judiciary Article and do not preclude or prohibit the 1968 amendments.

### Nonelected Delegates

Act No. 2 of 1967 provided for the election of 150 delegates and the selection of 13 delegates. These 13 delegates were political leaders of the Legislature** and "shall be members ex officio of the convention and shall have the powers of elected delegates."

---

* Italics, ours.

** The Lieutenant Governor, the President Pro Tempore of the Senate, the Majority Leader of the Senate, the Majority Whip of the Senate, the Minority Leader of the Senate, the Minority Whip of the Senate, the Minority Caucus Chairman of the Senate, the Speaker of the House, the Majority Whip of the House, the Majority Leader of the House, the Minority Leader of the House, the Minority Whip of the House, and the Minority Caucus Chairman of the House.

Appellants contend that since thirteen of the 163 members of the Constitutional Convention were not elected to the convention, almost a million citizens of Pennsylvania were disenfranchised in their representation at the convention. They point out that since 82 votes (a majority) could approve a proposal at the convention, and if the thirteen nonelected delegates should be included in these 82, then only 69 of the 150 delegates elected by the people would be needed to adopt a proposal.

Appellants further specifically claim that the existence of nonelected delegates deprives the voters of Pennsylvania of equal representation to which they are entitled under the equal-protection clause of the Fourteenth Amendment to the Constitution of the United States. In support of this contention, appellants cite the recent reapportionment cases of the United States Supreme Court, including *Baker v. Carr*, 369 U.S., supra; *Reynolds v. Sims*, 377 U.S., supra; and *Gray v. Sanders*, 372 U.S. 368, and *Lucas v. Colorado Gen. Assembly*, 377 U.S., supra. Cf. also the very recent case of *Hunter vs. Erickson*, 393 U.S., supra.

The function of the Constitutional Convention was to propose and *recommend* to the electorate of Pennsylvania changes and alterations in the existing State Constitution. The Convention had no law-making powers of any kind. Act No. 2, Sections 7, 8 and 9. The approval or disapproval of the Constitutional Convention's proposed amendments in April of 1968 was submitted to the electorate of Pennsylvania solely on a statewide basis, which is the purest form of "one man, one vote." If the convention which submitted the proposals did not represent all of the voters of the State equally, this defect was clearly cured by the approval of the voters at the April 28, 1968 statewide election.

We find no merit in this contention of appellants.

Since the delegates to the Constitutional Convention had no power to bind the people, and since a majority of the electorate of Pennsylvania voted to adopt the new Judiciary Article, the appellants cannot claim injury or Constitutional infirmity from the manner in which the delegates were chosen.

### Discrepancies Between Convention Journals and the Final Proposed Amendments

This contention of the appellants has so little merit that we shall dismiss it by merely referring to the following cases which specifically or by analogy decide the question adversely to the appellants. *Mikell v. Philadelphia School District*, 359 Pa. 113, 124, 58 A. 2d 339; *McGuigen Estate*, 388 Pa. 475, 482, 131 A. 2d 124; *Martin Estate*, 365 Pa. 280, 74 A. 2d 120, and cases cited.

### Habeas Corpus and Waiver of Jury Trial

Appellants' contention that (1) the right of the people to a writ of habeas corpus and (2) their right to a jury trial has been abrogated or nullified, is utterly and completely devoid of merit. See Article I, Sections 6 and 9 and 14, and Article V, Section 25, of the new Constitution of Pennsylvania; and Article I, Section 9(2) and Article III, Section 2(3) of the Constitution of the United States.

### Separation of Powers

Appellants vigorously urge this Court to declare the new Judiciary Article of the Pennsylvania Constitution null and void on the ground that it violates the traditional and fundamental concepts inherent in the

422

separation of jurisdiction and powers among the three branches of our Republican Form of Government (Art. IV, Sec. 4, of the Constitution of the United States). Throughout the history of our Country, the dividing line between and the boundaries and powers of the three separate co-equal branches of our Government,— namely, the Executive and the Legislative and the Judicial—are sometimes indistinct and are probably incapable of any precise or exact definition. This indefiniteness and unboundarized jurisdiction and power has often caused heated controversy in our National Capital. Generally speaking, the Executive branch has the power to recommend legislation and the power and the duty to see that the laws are faithfully administered and carried out. The Legislative branch has the power and the duty to pass legislation; and the Courts have the power, the duty and the responsibility of interpreting the Constitution and all legislation and determining whether legislation and presidential orders and all other questions and issues meet or violate the requirements of the Constitution.

In the light of these premises, we shall now discuss more specifically the provisions of the new Judiciary Article which are alleged to violate, obliterate and destroy the jurisdiction and the powers of the third branch of our Government, namely, the Judiciary, and in this case particularly, the Supreme Court of Pennsylvania.

The new Article V provides:

"Unified Judicial System

"Section 1. The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, . . .

"Supreme Court

"Section 2. The Supreme Court (a) shall be the highest court of the Commonwealth and in this court

shall be reposed the supreme judicial power of the Commonwealth;

. . .

"Judicial Administration

"Section 10. (a) The Supreme Court shall exercise general supervisory and administrative authority over all the courts and justices of the peace, including authority to temporarily assign judges and justices of the peace from one court or district to another as it deems appropriate.

"(b) The Supreme Court shall appoint a court administrator and may appoint such subordinate administrators and staff as may be necessary and proper for the prompt and proper disposition of the business of all courts and justices of the peace.

"(c) The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the judicial branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions."

The Judiciary Article provides for additional powers to be vested in and exercised by the Supreme Court.

However, in numerous other provisions of the new Judiciary Article for the whole State, and likewise special provisions for the City of Philadelphia, Allegheny County and the City of Pittsburgh, the Article contains language "until otherwise provided by law," or similar language.*

The Constitution of 1874 contained similar provisions which used the phrase "as shall or may be provided by law", or almost identical language.** In the 94 years of its existence, this or similar phraseology was interpreted by the Supreme Court and caused no serious dissension or irreparable conflicts.

. Appellants have raised a number of additional objections which relate in lesser or greater degree to the broad question of separation of powers. These include the contention (a) that the new Article V went beyond the call of the Convention, and (b) that the Legislature may not be given the power to establish new Courts, even though under Article V, Section 1 of the Constitution of 1874 the Legislature has over the years established the Superior Court as well as additional County and Municipal Courts, and (c) that there has been a deprivation of the original jurisdiction of the Supreme Court as ordained in the 1874 Constitution and an infringement of the King's Bench powers of the Supreme Court. We find each of these contentions to be devoid of merit on the issue here involved.

When the meaning or interpretation and the Constitutionality of a particular provision, section or sentence of the new Constitution is properly raised, the question and issue so raised can be determined in that suit, but such determination would not affect the Constitutionality of the entire Judiciary Article.

Decree affirmed, each party to pay own costs.

---

* See particularly Sections 1-10; Sections 16, 17, 18, 20, 21, 25.
** See particularly Sections 1, 3, 6, 7, 8, 12, 18 and 20.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the result reached by the majority in affirming the decree of the court below. However, I deem it appropriate to discuss further appellants' contentions dealing with the abrogation of the right to habeas corpus, the right to civil jury trial and the King's Bench powers of this Court.

Appellants urge in their brief that "in the Judiciary Article . . ., for all its verbiage nowhere does it tell us in which court the great writ of habeas corpus is for all time to be found, and protected from the ill winds of political chicanery." This statement on its face appears correct; however, appellants' inquiry into the future viability of the writ of habeas corpus should not end with Article V. Certainly the Constitution is an integrated document and clauses in one article must be read in light of the provisions of all the others. It is made quite clear in Article I, Section 14 "that the privilege of the writ of habeas corpus shall not be suspended." And lest it be thought that while not suspended, the Legislature might choose to withdraw jurisdiction over such writs from the courts of this Commonwealth, §11 of the same Article clearly provides "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Therefore, it is abundantly clear that the "Great Writ" retains its historical character as the ultimate and essential safeguard of individual rights and that the courts of the Commonwealth of Pennsylvania must and will continue to make its protections available.

Appellants also contend that the Constitutional Convention abrogated the right to trial by jury in civil cases. To support this argument they point to §25 of

Article V: "Section 25. Dispensing with Trial by Jury.—*Until otherwise provided by law,* the parties, by agreement filed, may in any civil case dispense with trial by jury, and submit the decision of such case to the court having jurisdiction thereof, and such court shall hear and determine the same . . . ." (Emphasis supplied.) While appellants concede that the unitalicized portion merely grants civil litigants the right to waive a jury trial, their argument is that "Until otherwise provided by law . . ." means that the Legislature can provide another procedure other than mutual waiver which will result in the abrogation of the right to trial by jury.

However, I find that argument particularly unpersuasive. The error in appellants' reasoning lies in the narrow interpretation they place on the meaning of the word "law." It is my view that such a narrow interpretation not only was not intended by the framers of this Section, but also would yield an unreasonable result. For if the appellants are correct, what would be the meaning of Article I, §6, which guarantees "Trial by jury shall be as heretofore, and the right thereof remain inviolate"? The better view is that the word "law" includes not only statutory law, but also case law and constitutional law. Thus, so long as Article I, §6 is not repealed or amended by a future constitutional convention or constitutional amendment, any statutory law which attempted to change the right to trial by jury in civil cases would be a nullity.

The third contention of appellants to which I want to address myself is that dealing with the elimination of this Court's King Bench powers and the failure to provide for separation of powers between the legislative and judicial branches of our government. Appellants' argument focuses on §2(c) of new Article V, which states "Section 2. Supreme Court.—The Supreme

Court . . . (c) shall have such jurisdiction as shall be provided by *law*." (Emphasis supplied.) Once again appellants' reasoning is based on an erroneous and excessively narrow construction of the word "law." They would have us interpret "law" to mean only legislatively passed statutory law and then view this Court's jurisdiction as completely at the whim and caprice of the Legislature.

However, such an interpretation of a broad word like "law" is erroneous in this context. The preferred interpretation of that clause *must* include not only statutory law, but also case law, Pennsylvania Constitutional law and United States Constitutional law. When viewed in this light, it is obvious that the jurisdiction of the Pennsylvania Supreme Court is still very much intact and that action by the Legislature can in no way restrict our essential judicial functions. First, the new Constitution provides in Article V, §1 that "The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court . . . ." Further, §2 of the same Article announces "The Supreme Court (a) shall be the highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth." Finally §10 of the Constitution explicitly establishes that "The Supreme Court shall exercise general supervisory and administrative authority over all the courts and justices of the peace" and that it "shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts."

All of these quoted provisions are *constitutional* and the guarantees and safeguards inherent in these provisions could *never* be limited or eliminated simply by legislation. In addition, there are other functions inherent in the Commonwealth's judicial power which are required by federal constitutional law. It could

never be validly asserted that these requirements might be amended or restricted by an act of the Pennsylvania Legislature. In short then, and without citing specific examples, it is my view that to read Article V, §2(c) to mean that the Legislature has complete plenary control over the jurisdiction of this Court is completely incorrect; therefore appellants' argument that the essential separation of powers has been violated must fail. The Legislature, in attempting to define the jurisdiction of this Court, cannot infringe on the limitations, as judicially interpreted, that are in the Pennsylvania and United States Constitutions.

Appellants in a like manner argue that the King's Bench powers of this Court as set out in the Act of May 22, 1722, 1 Sm. L. 131, §XIII, have been eliminated. But, even a cursory glance at the judiciary provisions of the Constitution indicates that this argument is without merit. In fact, it appears that some of the original King's Bench powers of our Court have now been recited in the Constitution. First, the Court has constitutionally enunciated power to remove and discipline judges under Article V, §18(h). In addition, the right to transfer judicial manpower in light of the overall needs of the Commonwealth is set out in §10(a) of the same Article. Further, the provisions of §10 quoted above clearly describe the general supervisory and administrative authority of the Supreme Court over all other courts and justices of the peace. Finally, Article V, §2 provides, in the last analysis, conclusive response to the appellants' concern. This clause speaks of the "supreme judicial power" reposing in this Court and can mean no less than that this Court possesses every judicial power that the people of the Commonwealth can bestow under the Constitution of the United States. I think that these considerations taken together obviously illustrate that the King's

Bench powers of this Court have in no way been restricted. The judicial power reposed in this Court will continue as before, unimpaired by any mistaken notion that the Legislature has the constitutional authority to diminish, curtail or interfere with its functions.

Mr. Justice JONES and Mr. Justice POMEROY join in this concurring opinion.

————

DISSENTING OPINION BY MR. JUSTICE COHEN:

In *Wells v. Bain*, 75 Pa. 39, 47 (1874), Chief Justice AGNEW wrote that there are "but three known recognized modes by which the whole people, the state, can give their consent to an alteration of an existing lawful frame of government, viz.:

"1. The mode provided in the existing constitution.

"2. A law, as the instrumental process of raising the body for revision and conveying to it the powers of the people.

"3. A revolution.

"The first two are peaceful means through which the consent of the people to alteration is obtained, and by which the existing government consents to be displaced without revolution. The government gives its consent, either by pursuing the mode provided in the constitution, or by passing a law to call a convention. If consent be not so given by the existing government the remedy of the people is in the third mode—revolution."

Even if we ignore appellants' contention that Act No. 2 of the 1967 Session did not properly follow Article 18 of the 1874 Constitution, we must, nevertheless, determine whether a proper body for revision of the existing lawful frame of government was constituted by Act No. 2. I am constrained to hold that because §2 of the Act provides for 13 *ex officio* members in addition to 150 elected delegates, that the *ex officio*

members so dilute the elected body established for revision of the frame of government that it is not representative of the whole people and hence, unlawful and void.[1]

The essence of a constitutional convention is only maintained if it represents the people. It is a substitute for the gathering of the entire populace. The presence of *ex officio* delegates exercising the full powers of elected delegates is foreign to the concept of a convention as a gathering of the people. Thus, there was no convention and nothing which flowed from it is valid even if the product of the convention is subsequently approved by the majority of the voters.

I recognize that the leadership of the General Assembly that approved the Act held within their political power the "yes" or "no" on whether a constitutional convention should be called. But those in favor of a convention should not have surrendered the very essence of government in order to have the General Assembly pass the call. The cost was too high. It permitted the leadership of the General Assembly to become part of the convention without exposing themselves to the will of the people, and to influence, if not control, the convention's deliberations.[2] I see a

---

[1] Section 2 provides, inter alia: ". . . In addition, the Lieutenant Governor, the President Pro Tempore of the Senate, the Majority Leader of the Senate, the Majority Whip of the Senate, the Minority Leader of the Senate, the Minority Whip of the Senate, the Minority Caucus Chairman of the Senate, the Speaker of the House, the Majority Leader of the House, the Majority Whip of the House, the Minority Leader of the House, the Minority Whip of the House and the Minority Caucus Chairman of the House shall be members ex officio of the convention and shall have the powers of elected delegates."

[2] Section 5 provides, inter alia: "The Lieutenant Governor, the President Pro Tempore of the Senate, the Majority Leader of the Senate, the Majority Whip of the Senate, the Minority Leader of the Senate, the Minority Whip of the Senate, the Minority

dangerous threat to government as we know it by acquiescing in this unprecedented usurpation.[3]

I cannot accept the contention that all prior improprieties and illegalities are rectified by the ratifying vote of the electorate.[4] Procedures in government

Caucus Chairman of the Senate, the Speaker of the House, the Majority Leader of the House, the Majority Whip of the House, the Minority Leader of the House, the Minority Whip of the House and the Minority Caucus Chairman of the House shall constitute a Preparatory Committee to make arrangements for the convention. . . . The committee shall initiate any studies, inquiries, surveys or analyses it may deem relevant through its own personnel or in cooperation with any public or private agencies, including institutes, universities, foundations or research organizations. In so doing, the committee may hold public or private hearings. It may issue subpoenas under the hand and seal of its chairman commanding any person to appear before it and to answer questions touching matters properly being inquired into by the committee and to produce such books, papers, records and documents as the committee deems necessary. Such subpoenas may be served upon any person and shall have the force and effect of subpoenas issued out of the courts of this Commonwealth. . . . The committee may request and shall receive from any department, division, board, bureau, commission or agency of the State or any political subdivision thereof such facilities, assistance and data as it deems necessary or desirable to carry out properly its powers and duties. The committee is hereby authorized and empowered to make and sign any agreements, and to do and perform any acts that may be necessary, desirable or proper to carry out the provisions of this act. The committee shall also prepare budgets for the holding of the constitutional convention. . . ."

[3] ". . . Common sense would indicate that delegates intended to represent, first, the electoral body, and, through that, the sovereign, if they are to represent truly the different phases of opinion current among the people at large, should be *chosen by the entire electoral body*. . . ." (Emphasis supplied). Jameson, Constitutional Conventions, page 258 (4th ed. 1887). No precedent can be found in any authority on constitutional conventions for the inclusion of *ex officio* members.

[4] The "People's Convention" of Rhode Island in 1841 as described in *Luther v. Borden*, 7 How. 1 (1849), provides a useful analogy. Mass voluntary meetings were held in Providence which

instituted for the protection of the mass of people are designed to protect them from the rule of the majority. Our concepts of democracy and minority rights have far transcended the philosophy that "might makes right."

I dissent.

---

resulted in the appointing of a committee with the power to call a constitutional convention. The committee made the call, providing for full and free voting in Rhode Island. *The Constitution as prepared by the convention was approved by the majority of the voters of the state.* The existing government refused to leave office or to recognize the new because it would not recognize a convention that resulted from the call of a voluntary group. The President of the United States, John Tyler, recognized the existing government and offered military aid in putting down the "rebellious" insurgents. The Supreme Court held in *Luther v. Borden* that this was a proper function of the President and thus upheld his determination. The lesson to be learned from the Rhode Island experience is that the subsequent approval of a constitution by the populace does not cleanse the taint that surrounds the convention that evolved that constitution.