72 A.3d 255

**Judge Rochelle S. FRIEDMAN, Judge Alan M. Rubenstein, in her and his Official Capacity, Robert H. Riefle, Bonita L. DiCarlo and Thomas A. Beckley, Individually and on behalf of Qualified Electors in the Commonwealth of Pennsylvania, Petitioners**

**v.**

**Governor Thomas W. CORBETT Jr., Court Administrator Zygmont A. Pines, Secretary Carol T. Aichele, and Treasurer Robert M. McCord, each in their Official Capacity, Respondents.**

Supreme Court of Pennsylvania.

July 16, 2013.

Thomas E. Groshens, Esq., Richard A. Sprague, Esq., Sprague & Sprague, Philadelphia, for Thomas A. Beckley, Bonita L. DiCarlo, Rochelle S. Friedman, Robert H. Riefle, Alan M. Rubenstein, and Eugene Edward J. Maier.

Gregory R. Neuhauser, Esq., John Bartley Delone, Esq., John G. Knorr III, Esq., Office of Attorney General, Harrisburg, PA, for Carol T. Aichele and Tomas W. Corbett, Jr.

Stephen A. Sheller, Esq., Kimberly A. Aponte, Esq., Brian Joseph McCormick Jr., Esq., Sheller, P.C., Philadelphia, for William J. Manfredi.

## OPINION

PER CURIAM.

On February 15, 2013, Senior Judge Rochelle S. Friedman, Judge Alan M. Rubenstein, and several individuals alleging a status as qualified electors who voted for Judge Friedman and/or Judge Rubenstein, filed in the Commonwealth Court a Petition for Review in the nature of a Complaint for Declaratory and Equitable Relief (the "Complaint"). Petitioners raised a single cause of action under Article I, Sections 1 and 26 of the Pennsylvania Constitution, claiming that Article V, Section 16(b) of the state charter—which mandates that judges retire on December 31st of the year they turn 70—should be struck down as contrary to Pennsylvania's Declaration of Rights, that is, Article I of the state Constitution. The jurists contended that Section 16(b) deprives them of their inherent right to be free of age-based discrimination; the

electors asserted that the provision denies them their right to elect and retain jurists of their choice and to have those candidates serve to the end of their commissions. Petitioners sought relief in the form of a declaration that the retirement mandate is unconstitutional, as well as an injunction restraining the named Commonwealth officials from enforcing it. Respondents lodged preliminary objections in the nature of a demurrer, and Petitioners answered. The parties filed legal memoranda in support of their respective positions.[1]

On May 10, 2013, having determined the existence of a substantial overlap among the issues raised in this case and two other matters which were pending in this Court—*Driscoll v. Corbett*, 19 MAP 2013, and *Tilson v. Corbett*, 20 MAP 2013—we assumed plenary jurisdiction over the present dispute on our own motion. See 42 Pa.C.S. § 726. Shortly thereafter, Petitioners filed an Application for Relief, requesting that we appoint a special master to "receive relevant testimony and evidence and allow Petitioners to create a developed record in support of the claims raised" in their Complaint. Application for Relief, at 12–13. In particular, Petitioners sought to introduce evidence supporting their claims that: mandatory retirement at age 70 is irrational; older Pennsylvania citizens are living and working longer than their 1968 counterparts; the compensation package available to senior judges is less valuable than that provided to commissioned judges; and individuals who voted for the judges in question believed that they were electing the judges to a ten-year term. The Commonwealth opposed the Application for Relief, arguing that the Complaint's allegations raise pure questions of law, and hence, no factual record is necessary.

After these pleadings were filed in our Court, we resolved the *Driscoll* and *Tilson* matters jointly, explaining that, in view of the "inalienable and indefeasible right [of the

---

1. The Commonwealth Court later approved the parties' Stipulations of Dismissal as to Court Administrator Pines and Treasurer McCord. The remaining Respondents, Governor Corbett and Secretary Aichele, are represented by the Attorney General of Pennsylvania, and will be referred to collectively as the Commonwealth.

people] to alter ... their government ... as they may think proper," PA. CONST. art. I, § 2, "a revision to the organic law of the Commonwealth will only be deemed to violate the constitution that it amends (if at all) where the challenger has shown—clearly, palpably, and plainly—that the amendment is so unreasonable as to be considered 'irrational.' " *Driscoll v. Corbett*, 620 Pa. 494, 522, 69 A.3d 197, 214 (2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 471, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991)). We determined that Article V, Section 16(b) did not fall into that category. To the contrary, we agreed with the highest appellate court of a sister state considering a similar constitutional provision, to the effect that:

> [T]he amendment at issue ... not only provides for the retirement of judges, but for their re-appointment as well. The restriction therefore results in an increase of judicial manpower by bringing in younger judges, while retaining the services of willing and able retired judges. It permits the orderly attrition of judges and promotes the advancement of general considerations of judicial efficiency. This insures the fitness of the judiciary as a whole and provides a judicial system of the highest caliber.

*Id.* at 516–17, 69 A.3d at 211 (quoting *State ex rel. Keefe v. Eyrich*, 22 Ohio St.3d 164, 489 N.E.2d 259, 264 (1986); some internal quotation marks and citations omitted). We continued that, "although we have no doubt that many individual judges would be capable of serving with distinction beyond their mandatory retirement date ... there are overall systemic goals that are rationally related to valid governmental and societal interests." *Id.* Ultimately we summarized our reasoning as follows:

> [T]here is colorable merit to Petitioners' position that, theoretically at least, there is some possibility that a constitutional amendment might impinge on inherent, inalienable rights otherwise recognized in the Constitution itself. Nevertheless, we do not believe that the charter's framers regarded an immutable ability to continue in public service as a commissioned judge beyond seventy years of age as

being within the scope of the inherent rights of mankind. Rather, in view of the people's indefeasible right to alter their government as they think proper through amending its basic charter, the mandatory retirement provision for judicial officers is subject to deferential, rational-basis review under both equal protection and due process, and it satisfies that standard. Therefore, although certain societal circumstances may have changed since 1968 when the challenged provision was added to the Constitution ... the proper approach of conforming the Constitution more closely with Petitioners' vision of how experiential changes should be taken into account is to pursue further amendment to the Pennsylvania Constitution.

*Id.* at 522–23, 69 A.3d at 214–15.[2]

In light of the above, any evidence that Petitioners seek to introduce concerning demographic changes that have occurred since 1968 would have no material effect upon the issue at hand. *See generally id.* at 517, 69 A.3d at 211 ("As for any demographic changes that have taken place since the amendment was adopted in 1968, moreover, they are irrelevant."). Additionally, evidence is unnecessary relative to the claim that the age–70 retirement mandate is irrational, since this claim represents a legal conclusion that we rejected in *Driscoll.* Furthermore, to the extent the Application may be construed to request an opportunity to submit proofs concerning the understanding or intent of individual voters,[3] these too would be irrelevant, for several reasons.

**2.** As in *Driscoll,* resolution of the Commonwealth's demurrer entails assessing whether, accepting as true all well-pleaded, material facts (together with all inferences reasonably deducible therefrom), the complaint is insufficient to establish Petitioners' right to relief. *See generally Driscoll,* 620 Pa. at 510–11 n. 8, 69 A.3d at 207 n. 8.

**3.** The Application for Relief does not explicitly ask for such an opportunity. It does, however, imply such a request, as it asks for the opportunity to make a record while also arguing that Petitioners' allegations differ from those in the *Driscoll* and *Tilson* cases by, *inter alia,* including a claim that the qualified electors who voted for Judge Friedman in 2001 believed that she would be able to serve a full ten years. *See* Application for Relief, at ¶¶ 6, 12–15.

First, relying on *Firing v. Kephart*, 466 Pa. 560, 353 A.2d 833 (1976), we developed in *Driscoll* that "judges who reach the constitutional retirement age are not elected to 'regular' terms—*i.e.*, six years in the case of a justice of the peace, or ten years in the case of judges and Supreme Court Justices— but instead, to terms that expire early due to the mandatory retirement provision." *Driscoll*, 620 Pa. at 520, 69 A.3d at 213. This is a fact of which voters are deemed to be aware, as explained in *Firing*. *See Firing*, 466 Pa. at 569, 353 A.2d at 837 (reasoning that, when the plaintiff ran for judicial office, Article V of the Pennsylvania Constitution "was law, and both he *and the electorate* had notice that if he was elected his new term would be affected by the retirement provision of Section 16(b)" (emphasis added)). It follows that, when individual electors voted for the Petitioner judges, they voted for them to serve a term that expired on December 31st of the year the judges turned 70.

Insofar as Petitioners seek to make an evidentiary record demonstrating that they were led to believe otherwise, such a record would be incapable of supporting their claim. In the first place, an uninformed, confused, or otherwise irrational vote "is just as much of a vote as a rational one." *Koppell v. N.Y. State Bd. of Elections*, 8 F.Supp.2d 382, 386 (S.D.N.Y. 1998); *cf. Ulland v. Growe*, 262 N.W.2d 412, 416 (Minn.1978) ("We know of no authority which would allow us to treat the votes of any voters, however ill-informed, as if they were somehow inferior [to] more thoughtfully cast ballots."). Second, to the degree Petitioners predicate their claim on an alleged ballot deficiency, the obvious remedy for such a circumstance, if proven, is to ensure that ballots are more informative. An alleged deficiency in how election authorities present a judicial ballot to the public cannot logically have any effect on the constitutionality of the judicial retirement provision.

 Finally, although the right of suffrage has been recognized as "fundamental" and "pervasive of other basic civil and political rights," *Bergdoll v. Kane*, 557 Pa. 72, 85, 731 A.2d 1261, 1269 (1999) (quoting *Moore v. Shanahan*, 207 Kan. 1, 486

P.2d 506, 511 (1971)), electors do not have an inherent, inviolate, pre-constitutional right to vote for judicial candidates whose terms of office are unaffected by a constitutionally-mandated retirement age. There is nothing in Article I of the organic law to suggest such a concept. Article V sets the term of office, either as a "regular" term, Pa. Const. art. V, § 15(a), or as a term that is "not regular" because of mandatory age–70 retirement. *Firing*, 466 Pa. at 566, 353 A.2d at 836; see *Driscoll*, 620 Pa. at 520, 69 A.3d at 213 ("Since the Constitution provides for mandatory retirement at age 70, the Constitution does not itself provide for the election of any judge for any term that extends beyond the age of 70."). An elector may choose whom to vote for, but the elector is not entitled to the judicial services of the elector's preferred candidate *beyond* that person's term of office. *Cf. id.* ("[T]his case is about Petitioners' effort to extend their term *beyond* the term for which they were elected by nullifying operative terms of the Constitution.").

Accordingly, nothing in the Application for Relief convinces us that a factual record could materially aid this Court in ruling on the Commonwealth's demurrer.

■ Turning to the demurrer itself, we note that many of the contentions advanced by Petitioners are foreclosed by *Driscoll*. The only two new substantive allegations raised by Petitioners are that: (a) qualified electors who vote for a judge have a constitutionally-protected entitlement to enjoy the "full service" of that judge, absent removal for cause, Complaint, at ¶ 72; and (b) the 2001 amendment to Article V, Section 16(b)—in which the retirement date was changed from the day the judge attains the age of 70 to December 31st of the year in which the judge attains that age—is irrational and unconstitutionally discriminatory because it results in a retirement age based solely on the contingency of the judge's birthday, *see* Complaint, at ¶ 40; *accord* Application for Relief, at ¶¶ 12, 16.[4] In discussing the Application for Relief, we have already rejected the first of these contentions.

4. In a variation on the claim that judges have a vested entitlement to serve ten years upon being elected or retained, Petitioners allege that

The second pertains to the 2001 change in retirement date from the judge's 70th birthday, to December 31st of the year the judge turns 70. Although this would appear to reduce the complained-of harm by extending the judge's term of office, Petitioners nonetheless argue that it compounds the irrationality of the 1968 amendment. *See* Complaint, at ¶¶ 35, 40. As such a contention constitutes an opinion or a conclusion of law, it need not be accepted for purposes of ruling on the demurrer. *See, e.g., Crozer Chester Med. Ctr. v. Dep't of Labor & Indus.*, 610 Pa. 459, 466, 22 A.3d 189, 194 (2011).

As in *Driscoll*—and, again, assuming, *arguendo*, that a state constitutional amendment can be declared invalid as substantively contrary to the constitution it amends—we must consider whether the classification approved by the voters in 2001 is "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the people's actions were irrational." *Driscoll*, 620 Pa. at 516, 69 A.3d at 210 (quoting *Gregory*, 501 U.S. at 471, 111 S.Ct. at 2406). We do not believe that a December 31st retirement date is irrational. To the contrary, it serves multiple rational purposes related to the public interest.

First, it improves the orderly succession of judges or justices by standardizing the retirement date of an outgoing judge so that it occurs at the end of the calendar year. This enhances predictability and aligns judicial terms with the terms of other governmental officials that end on or about the last day of the year. Secondly, delaying retirement until the end of the year reduces—or in the case of odd-year retirements, eliminates—judicial vacancies that previously arose when a jurist was forced to retire in the middle of the year. Such reduction or elimination serves to lengthen the term of an elected judge while shortening the term of a judge who is appointed to fill a vacancy. See *Barbieri v. Shapp*, 476 Pa.

Article V, Section 16(b) violates Article V, Section 16(a), which generally prohibits diminishing a judge's compensation during the judge's term of office. *See* Compliant, at ¶ 67. As reflected in *Driscoll*, however, the Constitution itself precludes such a claim since it limits judges' terms of office according the mandatory age–70 retirement criterion. *See Driscoll*, 620 Pa. at 519, 69 A.3d at 213.

513, 520, 383 A.2d 218, 222 (1978) ("[W]henever possible, election is the constitutionally prescribed method for filling judgeships in Pennsylvania. The appointment procedure of [Article V, S]ection 13(b) is a stopgap to fill seats that unexpectedly fall vacant."); *Berardocco v. Colden*, 469 Pa. 452, 459, 366 A.2d 574, 577 (1976) (same). At the same time, Section 16(b)'s discriminatory effect is minimal, in that the variance in actual retirement ages as between judges is always less than one year. That being the case, the standardization to end-of-year retirement readily passes scrutiny under the very lenient standard set forth in *Driscoll*, applicable to constitutional amendments approved by the electorate of Pennsylvania.

For the reasons supplied above, Petitioners' Application for Relief is denied, the Commonwealth's preliminary objections in the nature of a demurrer are sustained, and the Petition for Review is dismissed with prejudice.

Chief Justice CASTILLE files a concurring opinion.

Chief Justice CASTILLE concurring.

I agree that the gravamen of the complaint here is controlled by the core constitutional holding in *Driscoll v. Corbett*, 620 Pa. 494, 69 A.3d 197 (2013), and that further proceedings are pointless. However, this is not to say that I have no reservations, given the arguments presented, or that I believe that the constitutional scheme here is a particularly rational one. There obviously is discrimination in the constitutional provision at issue; it is based squarely on age; and the 2001 amendment allowing service to the end of the calendar year, rather than, for example, until the next election cycle, is a half-solution to the disruption caused by the age restriction.

If the judicial age restriction at issue here and in *Driscoll* represented mere legislation, I have little doubt that it would be unconstitutional. Limits upon service can be expressed in multiple ways (*e.g.*, term limits, the length of terms); this one is premised solely upon (older) age. A particularly young judge could serve for four decades; or an attorney could win election for the first time at age 69, turn 70 in the January in

which he assumes office, and then "be retired." The line is drawn solely upon age—no citizen past 70 need apply, no matter how well-qualified. Classifications based upon older age are sensitive and potentially invidious ones. But this age-based discrimination, particular to the judiciary, is not mere legislation—it is found in the Pennsylvania Constitution itself, and the constitutional issues are controlled by *Driscoll* and, more globally, *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

Notably, the age limitation set in place after the 1967–68 Constitutional Convention was not the subject of a specific, narrow question presented to the people for approval (in contrast to the provision concerning the manner of selecting judges, *see infra* n. 1; or the narrow 2001 amendment, which arose from the actions of the General Assembly, and once approved by the voters extended judicial service to the end of the year in which a jurist turns 70). Rather, it was included in a mass of wide-ranging reforms regarding a new Article V about the judiciary. *Driscoll,* 69 A.3d at 200, (noting that Article V was "completely rewritten" during the Convention).

Here is how the drafters described to the people the measure for ratification of these reforms at the April 23, 1968 Presidential Primary Election: "Shall Proposal 7 on the JUDICIARY, adopted by the Constitutional Convention, establishing a unified judicial system, providing directly, or through Supreme Court rules, for the qualifications, selection, tenure, removal, discipline and retirement of, and prohibiting certain activities by justices, judges, and justices of the peace, and related matters, be approved?" *Constitutional Proposals Adopted by the Convention,* THE PENNSYLVANIA CONSTITUTIONAL CONVENTION 1967–68, 7. The subject matter covered by this one-sentence ballot question, which includes unspecified "related matters," actually engendered twenty-five single-spaced, small-font pages of additional explication in a separate "Summary and Explanation" offered "for the convenience of the people." *Id.* at 26–50. Even this Summary and Explanation, which was apparently intended to be transmitted to the Pennsylvania electorate in some way in conjunction with the elec-

tion, was not to be "considered an official interpretation" of the proposed changes, which included, *inter alia,* the creation and composition of the unified judicial system and the courts embodied therein, the powers and duties of those courts, how judges would be elected and vacancies filled, the creation of a Judicial Inquiry and Review Board, rules for judicial candidates, and special considerations for the judicial districts of Philadelphia and Pittsburgh. *Id.*[1]

The Pennsylvania Constitution may be amended in two ways: via Convention, or via the procedure originating with the General Assembly specified in Article XI, Section 1. *Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474, 479 (1969); *see also* Harry L. Witte, *Amending the Pennsylvania Constitution,* THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, 847 (Ken Gormley ed., 2004) ("Pennsylvania has two recognized methods of proposing amendments, the legislative proposal mechanism, which is detailed in Article XI of the Constitution, and the constitutional convention, which

1. The revised Article V contained alternative methods for selecting judges: one by election and one by appointment, and explicitly noted that the determination of which system would prevail would depend upon a choice to be presented to the qualified electors at the primary election in 1969. *See* PA. CONST. art. V, § 13(d) ("At the primary election in 1969, the electors of the Commonwealth may elect to have the justices and judges of the Supreme, Superior, Commonwealth and all other statewide courts appointed by the Governor from a list of persons qualified for the offices submitted to him by the Judicial Qualifications Commission...."). The entirety of the revised Article V was then placed before the electorate in April 1968, including the alternative manners of judicial selection and the notation that the voters were to decide that question separately the next year. In May 1969, in a close vote (624,453 to 643,960) engaging barely 23% of registered voters, the electorate rejected the option of having an appointed judiciary selected through a "Judicial Qualifications Commission." *See* PA. CONST. art. V, § 14 & Note, "Operative Effect" (question of appointing justices and judges was rejected by voters; section 14 is not operative and Judicial Qualifications Commission does not exist); *Berardocco v. Colden,* 469 Pa. 452, 366 A.2d 574, 576 n. 4 (1976) ("In the primary election of 1969, the electors of Pennsylvania rejected the option of having an appointed judiciary which was presented to them by section 13(d) of Article V of the Pennsylvania Constitution."); Joint State Government Commission, *Ballot Questions and Proposed Amendments to the Pennsylvania Constitution: A Compilation with Statistics from 1958–2006,* Staff Report of the The General Assembly of the Commonwealth of Pennsylvania, 21 (2007).

enjoys no textual sanction."). The scope of amendments by Convention can be as broad as the authorization of the Convention. But, the Article XI amendment procedure has a significant limitation, similar to constitutional limitations governing most legislation,[2] to ensure that discrete subjects are subject to separate, meaningful vote: " ... When two or more amendments shall be submitted [to the qualified electors of the State] they shall be voted upon separately." PA. CONST. art. XI, § 1. If the complete rewriting of Article V had been accomplished via the Article XI process, it obviously would have been subject to a viable constitutional challenge. See *Bergdoll v. Kane*, 557 Pa. 72, 731 A.2d 1261 (1999) (ballot question encompassing amendments to both PA. CONST. art. I, § 9 and art. V, § 10(c), without allowing electorate to vote separately upon each of the amendments, held to violate art. XI, § 1); *see also Pennsylvania Prison Soc. v. Commonwealth*, 565 Pa. 526, 776 A.2d 971 (2001) (although Court was divided on whether multiple amendments were at issue, and proper test for measuring whether multiple amendments were at issue, no disagreement concerning the limiting effect of Article XI amendment process). Notably, the Article V provision regarding the method of selection of statewide judges and justices was presented in a separate election. *See supra* n. 1.

But, the complicated package of comprehensive amendments to Article V that included the brand new mandatory judicial retirement age was presented to the voters in 1968 in a package of reforms via the Convention procedure. Voters were faced with a yes or no vote on the whole package. It is fictional to say that voters who approved of such a massive constitutional revision affirmatively embraced any one measure within it, just as it would be fictional to say that all of the men eligible to vote on the original U.S. Constitution who voted in favor of it affirmatively embraced provisions respecting the perpetuation of slavery and weighting of federal power

**2.** *See* PA. CONST. art. III, § 3 ("No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.").

in favor of slave states via the "three-fifths compromise."[3] But, this is the way broad Constitution-making via Convention (as opposed to specific, single-subject adjustments arising via political determinations by the General Assembly) works: it involves precisely such difficult decisions, and voters have to decide whether or not to take the bad with the good.

The concern with the 2001 amendment, in my view, is not so much with its constitutionality, but with its practicality. The 1968 amendments specified that judicial elections occur in municipal election years, *i.e.*, in odd-numbered years. PA. CONST. art. VII, § 3. Judges can "age out" at any time within the two years between elections, meaning that judges born in even-numbered years will be retired a year before their seat can be filled. This does not present a difficulty in the lower courts, where senior judges. can fill the void; and indeed, many judges who reach mandatory retirement age immediate-

---

**3.** Article I, Section 2 of the U.S. Constitution originally provided that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." Under the provision, slave states would receive dispropor-tionate representation in the U.S. House of Representatives (and there-fore also an increase in presidential electors) based upon inclusion of a percentage of their resident slaves in apportioning the House. Gou-verneur Morris, one of Pennsylvania's delegates to the 1787 Constitu-tional Convention, was recorded by James Madison as stating during debate on the measure: "Upon what principle is it that the slaves shall be computed in representation? Are they men? Then make them Citizens and let them vote.... The admission of slaves into the repre-sentation when fairly explained comes to this: that the inhabitant of Georgia and South Carolina who goes to the Coast of Africa, and in defiance of the most sacred laws of humanity, tears away his fellow-creatures from their dearest connections and damns them to the most cruel bondage, shall have more votes in a government instituted for the protection of the rights of mankind, than the Citizen of Pennsylvania or New Jersey who views with a laudable horror, so nefarious a practice." Wendell Phillips, THE CONSTITUTION. A PRO-SLAVERY COMPACT· OR SELECTIONS FROM THE MADISON PAPERS, ETC., 29 (2nd ed., 1845). Following a bloody Civil War, the clause was abrogated by the Fourteenth Amendment. U.S. CONST. amend. XIV, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers, count-ing the whole number of persons in each State, excluding Indians not taxed.").

ly enter into senior service. On the Supreme Court, however, extending a term only to the end of the year a Justice turns seventy leads to a disruptive one-year vacancy for those Justices born in even-numbered years; notably, four of the six Justices currently serving on the Court were born in an even-numbered year. The General Assembly, which apparently is considering recommending a constitutional adjustment to address the age discrimination feature of Article V, may want to keep this additional fact in mind.

Sensitive as I am to how the health and mental acuity of mature Americans have improved since 1968, and sensitive as I am to the concerns of the distinguished jurists who have served this Commonwealth well and who have brought these challenges, I do not view the existing provisions subject to challenge, problematically discriminatory as they are, to be unconstitutional under our charter, and as for the federal question, *Gregory* is the law of the land, and this Court is duty-bound to enforce it.